1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHARLES STEVENS,

        Plaintiff,

  v.

RON DAVIS, Warden,
San Quentin State Prison,

        Defendant.
_____/

No. C 09-00137 WHA

<u>DEATH PENALTY CASE</u>

**ORDER DENYING CLAIMS
AND MOTION TO STAY
AND GRANTING MOTIONS
TO FILE OVERSIZE BRIEFS**

**INTRODUCTION**

A jury convicted petitioner, Charles Stevens, in 1981 of, inter alia, four counts of
murder and six counts of attempted murder (Cal. Penal Code 187(a)), accompanied by a
lying-in-wait special circumstance (Section 190.2 (a)(15)) as to one murder and a
multiple-murder special circumstance (Section 190.2(a)(3)). Through counsel, petitioner filed
a petition for writ of habeas corpus under Section 2254 raising twenty-eight claims for relief.
He subsequently dismissed eight of those claims. An additional round of claims, four of the
subclaims within Claim 5 and all of Claim 23, were dismissed on procedural default grounds.
The parties have now briefed twelve of the nineteen claims remaining in the petition. Petitioner
seeks permission to file oversized opening and reply briefs for both rounds of briefing. The
motions to file oversized opening and reply briefs are **GRANTED**. Claims 2, 3, 4, 5, 7, 8, 9, 10
and 18 are **DENIED** for the following reasons. Claim 6 is **DISMISSED** as procedurally defaulted.
Claims 1 and 12 will be addressed by subsequent order.

**STATEMENT**

Petitioner is a condemned inmate at San Quentin State Prison. Between April 3 and July 27, 1989, petitioner shot at victims on or near Interstate 580 in Oakland. All of them, save for one, were inside a car at the time of the attack. Petitioner killed four people: Leslie Ann Noyer, Lori Anne Rochon, Laquann Sloan, and Raymond August. He attempted to murder an additional six people: Karen Alice Anderson, Janell Lee, Julia Peters, Paul Fenn, Upendra de Silva, and Rodney Stokes. Prosecutors charged petitioner as to all the offenses and charged a codefendant, Richard Clark, as to Noyer's murder. Clark testified in his own defense. The jury deadlocked on the murder charge against Clark and the trial court declared a mistrial. It convicted petitioner of all charges and sentenced him to death. The facts adduced at trial follow.

Ballistics evidence connected petitioner's Desert Eagle firearm as either a direct match or consistent with the weapon used in all of the shootings except for the attempted murder of Stokes.

In the early morning of April 3, 1989, police responded to a call regarding gunshots and found Leslie Noyer lying on the ground in front of a Mazda RX7 with its doors open and the engines running. Noyer had been shot in the head. Police found shell casings and an unexpended copper-jacket bullet near the vehicle. A palm print retrieved from the door below the passenger side window matched petitioner and two other prints matched codefendant Clark. The found casings matched petitioner's gun, when it was eventually recovered.

On June 7, a little after 2:00 a.m., Karen Anderson drove herself and her friend Janelle Lee home. As Anderson turned a corner on the way home, Lee saw a man with his arms raised and pointing at them, though she did not see anything in his hands. The man shot at them, shattering the passenger window. He did not hit either of them. When Anderson had the window repaired, the repair person found shell casings, which he gave to her. Those casings also eventually matched petitioner's Desert Eagle.

Laquann Sloan was shot in the head around 11:45 p.m. on June 8. Police found three shell casings that matched petitioner's gun.

On July 6, Highway Patrol officers found Lori Rochon slumped over her seat on the side of Interstate 580 near the Grand Avenue exit in Oakland. She had been shot one time. A police search of the area did not yield any casings. The police criminalist who examined the casings from all of the crimes said that the one found inside Rochon was consistent with a Desert Eagle. He noted that the slug contained polygonal rifling, which the other casings from the other crimes did as well. No other casings the Oakland Police Department had found in the past five years had such rifling.

Around 3:00 a.m. on July 16, Paul Fenn drove his friends Julie Peters and John Cutler eastbound on Interstate 580 near the Harrison Street exit. He intended to move into the right-hand lane and had noticed the headlights of another car there. When he looked to see if he was clear to move over, the headlights had disappeared and he could not see them anywhere. A pop sounded immediately to the right of the car and the right panel of the front windshield exploded. Other windows then shattered. The other car, a small, white sedan, waited about three seconds and then took off at high speed. Ten months later, Fenn found slugs and a copper bullet jacket in the van. They were consistent with a .38 or .357 Desert Eagle.

Later on July 16, Dr. Upendra De Silva was driving on Oakland Avenue after having exited Interstate 580. As he approached the top of the hill, he heard and felt the glass in his car shattering. He ducked down after recognizing the sound of gunfire. When he resurfaced several seconds later, he saw the taillights of a car in the right lane about 25-50 yards ahead. He got out, walked to a nearby apartment building, and asked someone to call the police. De Silva sustained injuries from the shattered glass and was shot in his right elbow. Police did not recover any casings there. The next day, however, police investigated a similar shooting one block away from where De Silva had been shot and one mile away from the Rochon murder. A casing found there matched petitioner's gun, when it was eventually recovered.

Police apprehended petitioner across the highway from the scene of the final murder. On July 27, at 1:15 a.m., petitioner, driving a white Mazda, pulled alongside Rodney Stokes, who was driving home from work on Interstate 580. Petitioner drove at approximately forty-five miles per hour. Both vehicles slowed. Stokes tried to discern if he knew the other

driver. Coworkers often motioned to Stokes on the freeway and chatted with him. Petitioner motioned to get Stokes' attention and then smiled at him. Stokes realized he did not know petitioner but tried to see if petitioner might have a passenger that Stokes did know. Petitioner then shot at him.

Stokes tried to avoid petitioner's attention by turning off his headlights, laying down on the seat, and slowing to about thirty miles per hour. He lost control of the car, but regained control shortly thereafter. When he looked up, he saw petitioner coasting in front of him, seemingly waiting. Petitioner fired two more shots. Petitioner then pulled away from Stokes, who began flashing his headlights to attract police attention. He sped up to try to stay with petitioner. They were approximately three-quarters of a mile away from the 35th Avenue overpass in Oakland.

Stokes saw petitioner slow down and pull alongside another car, one driven by Raymond August. Petitioner got August's attention and both sets of brake lights came on. As the cars rounded a bend, Stokes lost sight of the cars briefly. When he again spotted them, he heard at least two gunshots. Petitioner exited the freeway at the 35th Avenue off-ramp, drove over the freeway, and then took the onramp heading the opposite direction on Interstate 580. Petitioner parked on the shoulder.

August's car crashed into a pillar under the 35th Avenue overpass. Stokes pulled up behind August's car. He checked on August, who was covered in "[a]n awful lot of blood," and then saw petitioner's Mazda parked on the other side of the freeway. Stokes called 911. The police arrived and Stokes pointed out where petitioner was still parked. An officer drove over and ordered petitioner out of the car. Petitioner initially appeared startled and began to drive away. He got out of the car with his hands in the air, walked backwards, then fled on foot toward a retaining wall. The officer grabbed petitioner at the wall and heard a heavy metallic object hit the ground. The officer then retrieved petitioner's loaded .357 magnum Desert Eagle semiautomatic pistol, which petitioner later told police he'd obtained three or four months earlier in "[a]bout . . . March. A search of petitioner yielded a loaded magazine and a loose bullet. This seizure allowed the police to connect the firearm to the prior murders.

4

Stokes identified petitioner at the scene. The ammunition fragment recovered from Stokes' car was insufficient to make any comparison.

Police searched petitioner's room and found "an operator's manual for the weapon, a canvas gun case, gun cleaning equipment, a .357 magnum cartridge and magazine, trays of bullets, and practice targets." Additionally, they found a collection of articles about the shootings and "an envelope with handwritten references to what appeared to be various Penal and Vehicle Code sections including those regarding murder, assault, vehicle theft, and weapons offenses." Petitioner's palm print was found on Noyer's car.

The police interviewed petitioner. They asked him how a person who committed the crimes would get caught and petitioner replied, "The guy would get caught if somebody told on him or if he pulled over like I did."

During the guilt phase of trial, petitioner only presented evidence as to the Sloan murder. The victim, a 16-year-old, had been shot in the head. The three witnesses who testified did not see the actual shooting, though they had been present either right before or right after. Codefendant Clark testified as to the Noyer and Rochon murders. Clark had made multiple statements to the police regarding the Noyer murder. His story changed with each version. In his last statement, he said that he had shot Noyer because petitioner had threatened to shoot him if he did not. At trial, Clark once again changed his story, this time saying he was not present at the Noyer murder scene. Clark explained the variances in his accounts by saying he was afraid of petitioner and made up his statements using details from the police.

Clark also testified as to the Rochon murder. He said that early on the morning of July 6, while driving a stolen car with Clark as the passenger, petitioner started rocking back and forth, and said, "'Man, I got to shoot somebody.'" Petitioner then pulled alongside a car. Clark asked why he was going to shoot this person and petitioner said, "Okay. I'm not going to shoot this guy. I'll shoot somebody white." Petitioner then pulled alongside Lori Rochon's car, rolled down his side window, and shot at her. He told Clark he thought Rochon was a "white dude," and fired at her.

Clark's sister also testified. She said that in July 1989, Clark asked her to tell him when the news came on because petitioner had shot someone on the freeway. The news covered the shooting, identifying the victim as "Lori" and noting that she was shot on Interstate 580. Clark said that when he saw a July 18 article about the assaults on Fenn, Peters, and de Silva, he called petitioner and asked if petitioner had shot them. Petitioner said, "'Man, don't say that over the phone.'"

At the penalty phase, the parties stipulated that petitioner incurred a conviction in 1989 for three counts of felony auto theft.

Randall Shumpert testified to an incident in June 1987, wherein petitioner drove by a BART station where Shumpert stood at 10:00 p.m. The passenger in petitioner's car yelled at Shumpert and an angry exchange took place. Petitioner drove away, then returned a few minutes later with his headlights off, and shot at Shumpert through the car window. Petitioner then left.

The trial court received testimony regarding a 1988 incident wherein petitioner threw a carton of milk at a correctional officer in the county jail and encouraged other inmates to do so. In another incident, a sheriff's deputy overheard a threat that petitioner made against codefendant Clark during transit to the courthouse in March 1993. Petitioner said he would kill Clark for snitching.

Eight witnesses provided victim impact testimony regarding the accomplishments of their loved ones, and the effect of the murders on their own lives.

Petitioner's expert, psychiatrist Harry Kormos, testified about the conditions of petitioner's childhood and the results of psychological testing petitioner underwent. After ten meetings, each of which lasted for three hours, over a period of four to five months, Dr. Kormos concluded that petitioner had an unspecified personality disorder with schizoid and borderline personality traits. Dr. Kormos could not recall any of the several dozen people had diagnosed with the same disorder as having committed murder.

Dr. Kormos stated that petitioner did not have a mental illness and that all of the testing revealed no organic brain damage, illness, tumors, or malformations. He concluded that

petitioner did not suffer from fetal alcohol syndrome because petitioner's mother had stopped drinking five years before she had petitioner. Petitioner's intelligence quotient of 80 to 90 indicated below-average intelligence and he did have to repeat the ninth grade due for academic reasons; however, Dr. Kormos did not believe petitioner had an intellectual disability. During childhood, petitioner suffered several seizures. A childhood EEG showed an abnormality. Another EEG in 1993 showed no abnormalities.

Dr. Kormos also testified to the difficulty petitioner's mixed racial heritage could cause. Petitioner's mother was Native American, and his father Caucasian and Black. Petitioner had reported a good early childhood to Dr. Kormos. He said that he had been cared for by his parents in Oakland until he was about twelve years old. His mother devoutly practiced her faith as a Jehovah's Witness and he attended church with her. When he was twelve, though, that changed following a move with his mother and older sister to a reservation on the Nevada border.

Petitioner's mother resumed drinking. She stopped church and became verbally and physically violent. Police arrested her for child abuse for beating petitioner's older sister. Petitioner reported that he attempted suicide twice in a few days to get his mother's attention. He provided no medical records regarding the attempts and bore no scars, although he said he cut his wrists in the second attempt.

Petitioner's family returned to Oakland approximately a year later. Petitioner's mother obtained several arrests for drunk driving and spent a year in jail. She later threatened to throw petitioner out of a window and kill his sister. She was committed to Highland Hospital. She continued heavily drinking until her alcoholism resulted her death in March 1986 in front of petitioner.

Petitioner's brother, who was seventeen years older than petitioner, was convicted of murder in 1978. Dr. Kormos did not believe this to be emotionally relevant to petitioner because of the age difference and petitioner had not reported a close relationship with his brother.

Petitioner received two suspensions in middle school for disruptive behavior. He said he did not use drugs, though he tried marijuana when he was twelve and sold cocaine in high school to get money for clothes and jewelry. Petitioner stole a gun from a pawnshop where he worked and was fired for it.

Dr. Kormos said that petitioner could act altruistically and noted petitioner's care for his father as an example. In his youth, petitioner did attain some achievement when he won several trophies for bike racing.

Dr. Kormos said he could not "come up with a clear diagnosis as to why" petitioner murdered four people and attempted to kill six others. Petitioner never denied having committed the shootings, though he said he could not remember having done most of them. He did have "a patchy recollection of the August killing." Dr. Kormos thought that petitioner must have wanted, at least on some level, to be caught. He did not believe petitioner derived pleasure or satisfaction from the killings.

Jerry Enomoto, a former Director of the Department of Corrections, testified that petitioner, at most, would pose a nuisance in prison and would not be a danger to other inmates or staff. Three deputy sheriffs testified regarding petitioner's good behavior in jail, although one noted that petitioner had lost a job assignment for misconduct. *See People v. Stevens*, 41 Cal.4th 182, 187-192 (2007).

\*   \*   \*

The California Supreme Court affirmed petitioner's conviction and sentence on direct appeal on June 4, 2007. *Stevens*, 41 Ca1.4th at 1168. On January 7, 2008, the United States Supreme Court denied a petition for certiorari. *Stevens v. California*, 552 U.S. 1118 (2008).

On December 1, 2008, petitioner initiated the present habeas corpus action. That document was received on January 12, 2009. Counsel for petitioner, Robert Bryan and Mark Eibert, were appointed three years later. Through those appointed counsel, petitioner filed his Amended Petition for Writ of Habeas Corpus on May 21, 2014, asserting 28 claims. After a round of briefing and careful review and consideration, the Court granted petitioner's motion to withdraw eight of those claims from his petition (Dkt. No. 109).

Respondent filed a motion to dismiss a portion of Claim 5 and all of Claim 6 and Claim 23 on procedural default grounds (Dkt. No. 107). Petitioner failed to show cause and prejudice justice to excuse the default or that imposition of the procedural bar would result in a fundamental miscarriage. The four challenged subclaims of Claim 5 and Claim 23 were dismissed (Dkt. No. 126).

Lead counsel Robert Bryan moved to be removed from the case and that motion was granted (Dkt. No. 132). Attorneys Brian Pomerantz and Richard Tamor took over the case (Dkt No. 134). Petitioner has now briefed two rounds of merits claims and those claims are ready for decision.

## ANALYSIS

Following enactment of the Antiterrorist and Effective Death Penalty Act of 1996 (AEDPA), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of Section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. A state court decision unreasonably applies Supreme Court authority as articulated in the second clause of Section 2254(d)(1) if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that

principle to the facts of the prisoner's case." *Id.* at 413. A federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "As a condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 102.

A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340.

A district court must limit its review to the record that was before the state court that adjudicated the claim on the merits unless a petitioner can show the state court's decision to be unreasonable under 2254 Section (d)(1) or (d)(2). *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011).

**1.    CLAIMS 2 AND 3.**

Claims 2 and 3 respectively challenge the sufficiency of the evidence to support the lying-in-wait finding for the murder of Raymond August and to support the conviction for shooting into Paul Fenn's van.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a

10

constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id.* at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . . ." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam) (finding that the Third Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the evidence insufficient to support petitioner's conviction). A federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993) (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. *Jackson*, 443 U.S. at 324.

### A.    Lying-in-Wait Finding.

Petitioner challenges the lying-in-wait finding as to the murder of Raymond August. At the time he committed the crime, "the elements of the lying-in-wait special circumstance required an intentional killing, committed under circumstances that included a physical concealment or concealment of purpose; a substantial period of watching and waiting for an opportune time to act; and, immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." *Stevens*, 41 Cal.4th at 201, citing Cal. Pen. Code § 190.2, former subd. (a)(15). Petitioner argues that Rodney Stokes, the only eyewitness to the crime, did not testify that petitioner watched and waited for a substantial period of time prior to killing August (Sec. Rd. Br. at 3).

The California Supreme Court denied this claim, holding that California law does not require a specified amount of time to pass for a defendant to be found to have lain in wait. *Stevens*, 41 Cal.4th at 202–203. The court reasoned that the purpose of the lying-in-wait special circumstance separated homicides committed rashly from those committed after a period of deliberation. Because the jury found that petitioner had committed a first-degree murder of

August, it necessarily found a period of deliberation. Petitioner's driving ahead to August's car after shooting at Stokes and his inducement to get August to slow down, similar as he had done prior to shooting Stokes, was sufficient to conceal his purpose and lure August into a "vulnerable position by creating or exploiting a false sense of security." *Id.* at 203. The court found that the jury reasonably could have found that petitioner had taken August by surprise because August had slowed down and driven side-by-side with petitioner after petitioner approached him. That moment became an opportune time for petitioner to act, which he then did, by shooting and killing August. *Ibid.*

Petitioner argues that the California Supreme Court's decision constitutes an unreasonable application of *Jackson* and *Winship* to the facts of his case. He asserts that the court misinterpreted precedent on the issue and conflated first-degree murder with the lying-in-wait special circumstance. Allowing the jury's erroneous conviction to stand prejudiced him because if the lying-in-wait special circumstance were invalidated, it would leave only one special circumstance that was found true. Though the law required jurors to find unanimously that aggravating factors outweighed the mitigating ones, he argues, they did not have to agree which ones warranted imposition of the death penalty. Thus, absent one special circumstance, jurors could have voted against the death penalty (Sec. Rd. Br. at 7–10).

Respondent argues that Petitioner states a non-cognizable claim because he disagrees with the California Supreme Court's interpretation of state law (Sec. Rd. Opp. at 2–3). Even if petitioner had stated a cognizable claim, Respondent argues that the state court's denial of this claim was not unreasonable because evidence sufficient to meet the *Jackson* standard supported the conviction and any invalidation of the lying-in-wait special circumstance finding would not create an Eighth Amendment violation (Sec. Rd. Opp. at 4–7).

To the extent petitioner challenges the state court's decision based on a disagreement with that court's interpretation of the elements of the lying-in-wait circumstance, petitioner's argument fails. A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court on habeas review. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

Moreover, petitioner has not shown that the California Supreme Court denial of his claim constituted an unreasonable application of *Jackson* and *Winship* to the facts of his case. Ample evidence would support a reasonable trier of fact's finding of proof of guilt beyond a reasonable doubt for the lying-in-wait special circumstance.

Stokes testified that he slowed down when petitioner drove up next to him on the 580 freeway because petitioner slowed his vehicle and made a motion to Stokes, as though he knew him, and smiled at Stokes (19 RT 4002). Stokes stated that he looked for a passenger he may have known when he did not recognize petitioner (19 RT 4002–03). He then testified that after petitioner shot repeatedly at him, he watched petitioner approach another car further up the freeway, watched the other car match petitioner's speed as Stokes had done when petitioner initially approached him, and then heard petitioner fire shots at August (19 RT 4009–11). The jurors reasonably could have assumed that petitioner induced August to slow down the same way he had induced Stokes to do so. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995). "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts." *Coleman*, 132 S. Ct. at 2064.

The jurors reasonably could have drawn the inference from Stokes' testimony that petitioner lured August into a position of vulnerability by making August think that he knew or may have known petitioner such that he would be inclined to slow down, as Stokes had. Because California law does not attach a minimum time requirement to the "substantial period of watching and waiting for an opportune time to act" element of the special circumstance, the jurors reasonably could have found that petitioner's targeting of August and inducement to him to slow down constituted a sufficiently "substantial period of watching and waiting," and, as noted by the California Supreme Court, August's slowing of his vehicle created the "opportune time to act."

1    Because petitioner has failed to show that the California Supreme Court denial of this

2    claim constituted an unreasonable application of clearly established federal law or an

3    unreasonable application of the facts to that law, it is **DENIED**.

4            **B.      Shooting into Paul Fenn's Van.**

5    Petitioner also challenges the sufficiency of the evidence as to his conviction for the

6    attempted murder of Paul Fenn.  Petitioner argues that "after viewing the evidence in the light

7    most favorable to the prosecution, no rational trier of fact could have found that [petitioner]

8    shot into . . . Fenn's van" because none of the occupants of the van identified petitioner as the

9    shooter, the bullet fragments found by Fenn could not be linked definitively to petitioner's

10   Desert Eagle gun, and the shooting into Fenn's van was not sufficiently similar to the other

11   crimes for which the jury convicted petitioner to fall under a similar modus operandi (Sec. Rd.

12   Br. at 10–11).

13   The California Supreme Court denied this claim finding sufficient evidence on which

14   the jury could have convicted petitioner.  Specifically, the court cited the fact the shooting into

15   Fenn's van occurred in the early morning, as had all of the other shootings for which the jury

16   convicted petitioner; only a few minutes after Fenn's shooting, a similar shooting happened

17   several hundred yards away on another driver, de Silva, and the bullet recovered there was

18   traced definitively to petitioner's gun; the copper bullet fragments found in Fenn's van were

19   traced to a Desert Eagle, a rare type of gun; police found a newspaper article regarding the Fenn

20   and de Silva shootings in petitioner's bedroom; and when codefendant Clark saw coverage of

21   the shootings in the paper, he called petitioner and asked if petitioner had done them, to which

22   petitioner replied, "Man, don't say that over the phone." *Stevens*, 41 Cal.4th at 200–01.

23   Petitioner fails to show that this determination by the California Supreme Court

24   unreasonably applied federal law or the facts of his case to that law.  In addition to all of the

25   evidence cited by the state court upon which a reasonable juror could base a conviction, jurors

26   also heard evidence regarding the fact that petitioner on at least one other occasion shot into one

27   vehicle and then sped ahead to shoot into another as outlined in the discussion regarding

28   Claim 2, above.  Contrary to petitioner's assertion, the evidence supporting the conviction on

                                              14

the Fenn attempted murder charge extended well beyond the testimony of codefendant Clark.

Petitioner's arguments regarding the victim's inability to identify petitioner as the shooter and

the lack of conclusive findings that the bullet casings found in Fenn's van match his weapon

do not carry the day. If confronted by a record that supports conflicting inferences, a federal

habeas court "must presume-even if it does not affirmatively appear in the record-that the trier

of fact resolved any such conflicts in favor of the prosecution, and must defer to that

resolution." *Jackson*, 443 U.S. at 326. Because petitioner has failed to carry his burden, this

claim is **DENIED**.

### 2. CLAIMS 4 AND 18.

Claim 4 alleges that the prosecutor committed misconduct by referencing the death

penalty in his guilt-phase closing argument in an attempt to influence a verdict in favor of

first-degree murder as opposed to second-degree (First Rd. Br. at 105). He also raises in

Claim 18 an interrelated subclaim arguing that trial counsel's failure to ask the trial court to

"cite the prosecutor for misconduct in front of the jury" constituted ineffective assistance

(First Rd. Br. at 141).

### A. Prosecutorial Misconduct.

Petitioner specifically challenges the following statement by the prosecutor:

> Now, why go through all of this? The court is going to instruct you
> you're not to consider penalty in this phase of the trial. I mean, in
> the back of your heads you all know if we do certain things, we
> might be talking about whether he should live or die, and you're
> not supposed to consider that in deciding whether he's guilty of
> any of these crimes. [] In any of the special circumstance clauses,
> you're supposed to separate that and you all said you could do it.
> And while you're not supposed to consider penalty and
> punishment, Mr. Selvin, Mr. Berger and Mr. Stevens certainly are
> thinking about it. And what happens when you say these are all
> murders? No doubt about it. All of the attempted murders, they're
> all attempted murders, no doubt about it. Yeah, but they're only
> second degree murders. What happens if they're second degree
> murders? You can never find him guilty of the special
> circumstance. And they save his life or at least save —

(27 RT 5891). These comments, he argues, violate clearly established federal law that "when a

jury has no sentencing function, it should be admonished to 'reach its verdict without regard to

1  what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994), quoting

2  *Rogers v. United States*, 422 U.S. 35, 40 (1975).

3       The California Supreme Court denied this claim, finding that there was "no reasonable

4  likelihood the remark misled the jury as to whether it could consider punishment in its guilt

5  deliberations" because, following defense counsel's objection, the trial court instructed the jury

6  to disregard the comment and that the prosecution's comments constituted argument and not

7  evidence. *Stevens*, 41 Cal.4th at 205.

8       Petitioner argues that the California Supreme Court's "decision was based on an

9  unreasonable determination of the facts in light of the evidence presented in the state court

10 proceeding because the trial court's curative statements were inadequate and flawed" (First Rd.

11 Br. at 106). He says that the trial court fell short by failing to specifically address the

12 prosecutor's reference to punishment and, as such, likely confused the jury (*Id.* at 107).

13 Petitioner argues that the trial court needed to issue a "strong cautionary message necessary

14 to negate the damage" and should have instructed the jury at that moment that it could not

15 consider punishment as part of its deliberations, as opposed to waiting to the end of closing

16 arguments when it issued all of the jury instructions en masse (*ibid.*).

17      Respondent argues that the California Supreme Court denial of this claim is not an

18 unreasonable determination of the facts in light of the evidence before the court (First Rd. Opp.

19 at 14). He states that the court properly followed the standard set out in *Boyde v. California*,

20 494 U.S. 370 (1990), and notes that much of the case law petitioner relies on does not qualify

21 as clearly established federal law post-AEDPA (*Id.* at 14–15).

22      Following defense counsel's objection, the trial court stated, "Ladies and gentlemen, as

23 I've indicated to you previously, the statements of the attorneys and argument are not evidence

24 as you know with regard to the law. At the conclusion of the arguments I will be instructing you

25 as to the law that is applicable to this case. [] With regard to the last comment, I will direct you

26 to disregard it" (27 RT 5892). Later, the trial court instructed the jury not to consider penalty at

27 all in their deliberations regarding the crimes and special circumstances.

28

1    Petitioner has failed to show that the California Supreme Court denial of this claim

2  constituted either an unreasonable application of clearly established federal law or an

3  unreasonable application of the facts.  The first factor in determining whether misconduct

4  amounted to a violation of due process is whether the trial court issued a curative instruction.

5  When a curative instruction is issued, a court presumes that the jury has disregarded inadmissible

6  evidence and that no due process violation occurred.  *See Greer v. Miller*, 483 U.S. 756, 766 n.8

7  (1987); *Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (the Court condemned egregious,

8  inflammatory comments by the prosecutor but held they did not render the trial unfair since

9  the trial judge took curative actions).  This presumption may be overcome if there is an

10  "overwhelming probability" that the jury would be unable to disregard evidence and a strong

11  likelihood that the effect of the misconduct would be "devastating" to the defendant.  *See Greer*,

12  483 U.S. at 766 n.8; *Tan v. Runnels*, 413 F.3d 1101, 1115–16 (9th Cir. 2005) (finding trial fair

13  where jury received instructions five different times to consider only the evidence presented,

14  and not its sympathy for the victim's life story).

15    After defense counsel objected and asked the court to either to admonish or for a bench

16  conference, the trial court immediately advised the jury that the prosecutor's statements should

17  be viewed only as argument and not as evidence and instructed them to disregard the

18  prosecutor's statements (25 RT 5891–92).  "We presume that juries listen to and follow curative

19  instructions from judges." *Trillo v. Biter*, 769 F.3d 995, 1000 (9th Cir. 2014).

20  Later, the trial court instructed the jury, "In your deliberations the subject of penalty or

21  punishment is not to be discussed or considered by you.  That is a matter which must not in

22  any way affect your verdict or affect your findings as to the special circumstances alleged in this

23  case" (25 RT 5967).

24    Finally, the court and counsel extensively interviewed jurors during voir dire about their

25  ability to disregard the potential for the death penalty while determining petitioner's guilt on the

26  charged crimes.  Therefore, the jury knew going in to the guilt phase not to consider any possible

27  penalty when deliberating on the charges.  Because petitioner has failed to show that the

28

California Supreme Court denial of this claim constituted an unreasonable application of clearly established federal law or an unreasonable application of the facts to that law, it is **DENIED**.

### B. Ineffective Assistance of Trial Counsel.

Petitioner also challenges his attorney's handling of the alleged misconduct, arguing that the failure to request an admonition in front of the jury constituted ineffective assistance. In order to prevail on a Sixth Amendment ineffectiveness of trial counsel claim, petitioner must establish two things. *First*, he must show that counsel's performance was deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). *Second*, he must establish that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

To show "deficient performance," petitioner must show that counsel made errors so serious that they did not function as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687. Petitioner's trial attorney did ask the trial court to "admonish" the prosecutor or to approach the bench. The trial court granted the request for a bench conference. Petitioner cannot show that this constituted a serious error. His attorney addressed the situation immediately and asked that it be handled in a more serious manner than many of his other objections. Additionally, as discussed above, petitioner cannot show that the error prejudiced him. Accordingly, he has not met his burden and this subclaim of claim 18 is **DENIED**.

### 3. CLAIMS 5 AND 18.

Claim 5 alleges that the prosecutor committed multiple acts of misconduct during his closing statement that, when considered cumulatively, violated petitioner's constitutional rights. Petitioner challenges (1) statements about defense expert fees, (2) comments on petitioner's failure to preserve testimony from his father before his father passed away, (3) speculation as to why petitioner did not call his sisters to testify, (4) a statement wondering whether Dr. Kormos had suffered the loss of a loved one, (5) statements regarding an imaginary conversation the prosecutor had with victims, and (6) a statement to Dr. Kormos about a "scorecard" found in

petitioner's apartment (First Rd. Br. 103–129). Subclaims 4 and 5 previously were found to be procedurally defaulted in a June 26, 2015 Order (Dkt. No. 126 at 7-9) and were dismissed from the petition for failure to show cause and prejudice to overcome the default or that imposition of the procedural bar would result in a fundamental miscarriage of justice. The Court will not revisit those subclaims.

Claims 18 argues that trial counsel failed to respond appropriately or effectively to the prosecutor's repeated acts of misconduct, thereby exposing the jury to improper evidence (First Rd. Br. at 130).

### A. Statements About Defense Expert Fees.

During closing argument, the prosecutor said:

> [T]he testimony and the work of Dr. Kormos tallies up to $14,250. And what do you get for your money? Nothing. Nothing. Not one ounce of it explains why he's where he is today. Not one piece of it gives you anything about his character or his background that causes you any sympathy, to lend out any compassion to give a grant of mercy and spare his life. [] $14,250, and that's just Dr. Kormos. What have the other doctors cost? Gretchen White? We know that she saw him a number of times. Dr. Kaufman and Shonkoff, they saw him in April of 1991, saw him three times. What do they cost?

(31 RT 6916). Petitioner argues that these statements constituted misconduct because they were irrelevant and the prosecutor should not have encouraged the jury "to speculate about the costs of other experts" (First Rd. Br. at 109).

The California Supreme Court denied this claim, citing for context the prosecutor's subsequent statement:

> [T]he significance of the amount of money involved here illustrates that when the man's life is on the line, we are not going to be stingy, we'll give them those resources. See if you can find something. We'll give them to you. You need some bucks, $14,000 for Dr. Kormos? Fine, go ahead. You need some tests done? Fine, go ahead. We are not going to deny somebody a test that might provide something that might cause sympathy, compassion for him. But when all is said and done, it still comes up to a big zero

(31 RT 6917–18). *See Stevens*, 41 Cal.4th at 209. The state court reasoned that the totality of the argument constituted permissible argument that despite being expending significant resources, defense psychiatric experts proffered no explanation or mitigation for petitioner's

19

1    action. *Ibid.* Moreover, the jury had been instructed multiple times that attorney argument did

2    not constitute evidence (*see*, *e.g.*, 31 RT 6902, 7049, 7050).

3        Petitioner argues that this denial of his claim constituted both an unreasonable

4    determination of the facts and an unreasonable application of clearly established federal law

5    (First Rd. Br. at 108-09). He says that the time and expense information regarding Dr. Kormos

6    was irrelevant and the encouragement to speculate about other experts' fees improper.

7    Additionally, petitioner says the subsequent general instruction about the nature of attorney

8    argument did nothing to cure the misconduct in the moment.

9        "[C]ounsel are given latitude in the presentation of their closing arguments, and courts

10   must allow the prosecution to strike hard blows based on the evidence presented and all

11   reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir.1996).

12   "Improper argument does not, per se, violate a defendant's constitutional rights." *Jeffries v.*

13   *Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993). In evaluating a claim of prosecutorial misconduct

14   based on allegedly improper argument, the allegedly improper remarks must have "rendered the

15   proceedings fundamentally unfair." *Ibid.* (citing *Darden*, 477 U.S. at 181 (1986). Moreover,

16   both sides are allowed to suggest that an expert witness is biased because he received payment

17   for his testimony. *United States v. Preciado-Gomez*, 529 F.2d 935, 942 (9th Cir.1976) ("The

18   existence of bias or prejudice of one who has expressed an expert opinion can always be

19   examined into on cross-examination of such expert"); Christopher B. Mueller & Laird C.

20   Kirkpatrick, Federal Evidence, § 6:78 (3d. ed.2009) (noting that impeaching an expert by

21   inquiring about payment for their testimony is a common and permissible tactic).

22       As noted by the California Supreme Court, the argument regarding the defense's failure

23   to produce a sufficient mental health explanation or mitigation despite sparing no expense

24   constituted fair argument. The prosecutor's comments about the expense of trying to produce a

25   mental health diagnosis and the ultimate failure of the enterprise constituted the type of "hard

26   blows" allowed in closing argument and did not amount to misconduct that rendered the trial

27   fundamentally unfair. Accordingly, the state court decision was not contrary to, or an

28

unreasonable application of clearly established federal law, or based on an unreasonable

determination of the facts in light of the evidence presented. This subclaim is **DENIED**.

### B.     Petitioner's Failure to Preserve Testimony From His Father and Sisters.

Petitioner raises two subclaims challenging the prosecutor's statements during his

penalty phase closing argument regarding petitioner's failure to secure testimony from close

family members. The first subclaim argues that the prosecutor committed misconduct on two

grounds when discussing the possibility of procuring testimony from petitioner's father via

video: by making statements he knew not to be true and by accusing defense counsel of lying

in the presence of the jury. The second subclaim asserts that the prosecutor committed

misconduct by inviting the jury to speculate as to why petitioner's two sisters did not testify on

his behalf.

### *(i)     Factual Background.*

The challenged passages follow the prosecutor's general assertion that petitioner offered

no mitigating evidence. He began by saying:

> What type of evidence did you expect to have presented to explain
> to you his conduct, to explain to you about his character and record
> that would create some sympathy . . . some compassion for him?
> What did you expect to hear that would offset what he has done,
> the brutal murder of four people and the attempted murder of six
> others? What could you expect to have heard? What could there
> have been presented that would have kept open the idea of life
> without the possibility of parole as an appropriate sentence for his
> crimes? Basically, what didn't we hear about this defendant, and
> what are the things that you normally associate with someone who
> commits bad stuff?

(31 RT 6920–21). The prosecutor then detailed specific examples of mitigating evidence that

defendants in capital cases typically present that petitioner did not, such as a mental illness,

sexual abuse, deprivation of basic necessities as a child, crime as a way of life at home, not being

taught right from wrong, drug and alcohol abuse, mental disease or defect, caring for or

supporting others, remorse and acceptance of responsibility, and a broken home during his

formative years, (31 RT 6921–31).

After giving his own interpretation of the evidence on those elements, the prosecutor resumed discussing how he believed petitioner had failed to show evidence of good character or anything to merit saving his life. Petitioner challenges as misconduct the following statement:

> Now, who haven't you heard from? Who are some people that you would have expected to have heard from that you haven't heard from? Mr. Berger, in his opening statement to you, said the defendant doesn't have any family. He's an orphan. He doesn't have anyone to speak for him. [] Well, that's not correct. We know that his father died last summer. We know that. But you know, we can spend that kind of money to try and find something medically wrong with him, there are ways of preserving the testimony of witnesses who are ill, and who are elderly. You videotape their testimony and present it here. [] The defendant's father could have spoken to you.

(31 RT 6933.) Defense counsel objected, noting that he had made a motion to do just that but petitioner's father had fallen too ill to provide even videotaped testimony. The prosecutor responded, "Well, I disagree with that. And counsel says he doesn't like to speak, but that's a total lie" (*Id.* at 6933–34). The trial court once again instructed the jury that the arguments of counsel did not constitute evidence.

The prosecutor resumed his argument, making more comments about his perspective on the evidence regarding petitioner's relationship with his father and then venturing into petitioner's relationships with his sister and half-sister. He then said, and petitioner challenges as misconduct:

> [Prosecution:] And why weren't Gina and Sylvia called? Two logical inferences. One, they didn't want to testify to why —
>
> [Defense:] Your Honor, I'm going to object. [] This is pure speculation and inviting speculation on behalf of the jury as to what these people would have said and why they weren't called to testify. It's direct speculation.
>
> The Court: All right. The objection as to the beginning of that last part will be sustained. [] Move on.
>
> [Prosecution:] If they had anything positive, constructive to say to wring from you compassion and show you a basis of having sympathy and a basis for mercy to be given to this man, you would have heard it.
>
> [Defense:] I reiterate that objection, and ask the jury to be admonished with regard to the last comment.

22

The Court: As to the last statement, the objection will be overruled. Your objection is noted. [] Go ahead.

(31 RT 6937.)

### (ii)    *California Supreme Court Denial of Subclaims.*

Petitioner challenged both of these statements by the prosecutor on direct appeal and the California Supreme Court denied relief. It held that the statements addressing the absence of petitioner's father's and sisters' testimony constituted proper argument. *Stevens*, 41 Cal.4th at 210.

Regarding the comment about procuring petitioner's father's testimony, the state court noted that petitioner admitted the record did not make clear the reasons defense counsel never procured petitioner's father's testimony. Thus, the prosecutor may not have known the reason. Additionally, the court said that petitioner's argument that he had been sentenced to death on the basis of information "which he had no opportunity to explain or deny" failed because defense counsel had explained the absence in his objection to the prosecution's argument. *Ibid.* As to the prosecutor's comment on the sisters, the California Supreme Court said the jury never heard the entirety of the first statement because "the objection operated precisely as it was supposed to . . . ." *Ibid.*

### (iii)    *Analysis.*

Petitioner argues that the jury could not disregard the credibility attack on defense counsel and that the prosecutor knew or should have known that ill health thwarted defense counsel's examination of petitioner's father (First Rd. Br. at 110). Petitioner also asserts that the trial court's admonishment did not cure the prejudice imparted by the prosecutor's accusations because the comments related to an inference rather than to the introduction of evidence and that a more specific admonition was not given until the end of closing argument. Regarding the comments about petitioner's sisters' failure to testify, petitioner argues that the prosecutor's statements amounted to introducing evidence not in the record during his closing (First Rd. Br. at 114).

The prosecutor's statement that defense counsel was lying was improper. He came close to crossing the line a second time when he asked the jury, "[W]ho haven't you heard

23

from?" This kind of statement, in the right circumstances, could raise the spectre of petitioner's decision not to testify. Such unprofessional behavior would not be tolerated in most courts. However, the Court is not free to conduct a de novo review because petitioner has not shown that the state court's denial constituted an unreasonable application of clearly established federal law or an unreasonable application of the facts to that law. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as "'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The unreasonableness test is not a test of the reviewing court's "confidence in the result it would reach under de novo review." *Id.* at 102. Petitioner has fallen far short of making this showing.

"Absent specific evidence in the record, defense counsel should not be maligned." *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998). However, there is no constitutional error unless the comments were prejudicial to the point of denying the defendant a fair trial. *Ibid.* The Ninth Circuit has declined to find prejudice in similar circumstances. *See Sassounian v. Roe*, 230 F.3d 1097, 1106 (9th Cir. 2000) (declining to find prejudice where the prosecutor implied that defense counsel fabricated evidence, the judge sustained objections to the misconduct and instructed the jury that the attorneys' arguments did not constitute evidence, and the misconduct was limited to a few incidents during trial). Here, the trial court responded forcefully, cutting the prosecutor off, reinstructed the jury as to the nature of argument, and directed the prosecutor to move into another area (31 RT 6934).

Moreover, the accusation appears to have referenced an inconsequential matter. Toward the beginning of the prosecutor's closing, Attorney Selvin objected to one of the prosecutor's statements saying, "I don't want to make a speech. I never like to interrupt another person's argument (31 RT 6881). When the prosecutor accused Selvin of lying in the exchange regarding the availability of petitioner's father for video testimony, he said, "And counsel says he doesn't like to speak, but that's a total lie" (*Id.* at 6934). The "he" in the prosecutor's statement is ambiguous; however, the prior speaking objection by Attorney Selvin lends an inference that the prosecutor referenced that in his accusation. "A court should not lightly infer

that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation will draw that meaning from the plethora of less damaging interpretations." *Williams*, 139 F.3d at 744 (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)).

Petitioner also has failed to show that this comment prejudiced him. In cases involving prosecutorial misconduct based on improper remarks at closing, any risk of prejudice can be mitigated by the issuance of a curative instruction, which immediately follows and focuses upon such remarks. *United States v. Barragan*, 871 F.3d 689, 709 (9th Cir. 2017). Immediately following the prosecutor's statement that defense counsel was lying, the trial court said, "That's enough. With respect to that last comment, the jury is to disregard it. I've told you repeatedly that with regard to the arguments of counsel, the arguments of counsel are not evidence in this case" (31 RT 6934). Petitioner has not shown that the court's admonishment did not suffice to cure the harm. More importantly, he also has not shown that the California Supreme Court's denial, necessarily finding that the jury could disregard the attack upon Attorney Selvin's credibility, was unreasonable.

The prosecutor's comments on petitioner's failure to secure his father's testimony also could be construed as improper. A prosecutor properly may comment upon a defendant's failure to present witnesses so long as it is not phrased to call attention to defendant's own failure to testify. *See United States v. Castillo*, 866 F.2d 1071, 1083 (9th Cir. 1988). A comment on a failure to present witnesses is improper if it is manifestly intended to call attention to the defendant's failure to testify, and is of such a character that the jury naturally and necessarily would take it to be a comment on such a failure to testify. *See ibid.*

Here, the prosecutor began that portion of his statement by saying, "Now, who haven't you heard from? Who are some people that you would have expected to have heard from that you haven't heard from?" This could allude to the fact the jury did not hear from petitioner. However, the statement itself is ambiguous and, as noted, the most damaging meaning should not be inferred from that. *See Williams*, 139 F.3d at 744. The prosecutor's framework for his argument, specifically pointing out the absence in petitioner's mitigation case of all of the

things most capital defendants present at penalty phases, supports a less-damaging interpretation of the statement. The prosecutor did not leave his questions unanswered. He immediately followed up by mentioning that the jurors probably expected to hear from his family.

Petitioner has provided no clearly established federal law for the proposition that his "death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain" because of the prosecutor's insinuation. *Gardner v. Florida*, 430 U.S. 349, 362 (1977). Petitioner's citation to *Gardner* does not help him. In Gardner, the trial court tasked the jury in the sentencing phase with, among other things, making a recommendation as to whether petitioner should be sentenced to death or life without the possibility of parole. While the jury deliberated, the trial court ordered production of a presentence report to assist with making the final determination on the appropriate sentence. The jury returned a recommendation of life without the possibility of parole based on the fact they found that mitigating circumstances outweighed the aggravating factors. The trial court ultimately sentenced the petitioner to death, noting that it based its decision, in part, on the factual information contained within the presentence report. The probation department did not provide a portion of the report to the parties that it had deemed confidential. The withheld portion of the report was not included in the record on appeal. *Id.* at 352–54.

In *Gardner*, the trial court sought the introduction of new evidence and noted that it based its decision in part on that evidence, a portion of which was not provided to the defendant there or to the appellate court. An inference insinuated in an argument made in open court hardly compares. As the trial court repeatedly instructed petitioner's jury, the prosecutor's argument was not the same as evidence. Moreover, because the prosecutor said it in front of defense counsel, petitioner's attorneys had the opportunity to respond to it in the moment, which they did by proposing an offer of proof. They also could have responded to the insinuation in their closing argument. *Gardner* is, thus, inapposite. As such, petitioner has not shown the California Supreme Court's denial of this subclaim to be unreasonable.

When the prosecutor began discussing petitioner's failure to secure his sisters' testimony, he said that the jury could draw two inferences from petitioner's failure to secure his sisters' testimony. The trial court sustained defense counsel's objection before the prosecutor had even completed the first inference jurors could draw from the lack of testimony. It, however, denied the objection to the prosecutor's more general second statement, "If they had anything positive, constructive to say to wring from you, compassion and show you a basis of having sympathy and a basis for mercy to be given to this man, you would have heard it (31 RT 6937)." That statement falls squarely within the type of argument envisioned by *Castillo*, discussed above. As for the improper argument, the trial court admonished the jury and, as noted, instructed the jurors as to the proper role of argument. Jurors are presumed to follow their instructions. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). Petitioner has failed to show that the California Supreme Court's denial of this subclaim was an unreasonable application of clearly established federal law or an unreasonable application of the facts to that law.

Both subclaims are **DENIED**.

### C.     Scorecard Statement.

Police found an envelope in petitioner's apartment with a series of numbers on it, which the prosecutor argued represented various sections of the California Penal and Vehicle Codes and the number of times petitioner had violated those sections. The envelope contained one line that read, "190 0," which the prosecution theorized referred to subsection (b), the section governing punishment for killing a police officer. The trial court redacted that line on the ground that it was too prejudicial to petitioner (20 RT 4272).

Petitioner challenges as prejudicial misconduct the following exchange that occurred between the prosecutor and Dr. Kormos regarding the envelope:

> [Prosecution]:  Let's assume if there is another element on that score card, let's assume if there was another element that indicated an intent to murder a police officer —
>
> Mr. Berger:  Objection, Your Honor.
>
> Mr. Selvin:  Object, Your Honor, he knows better.

1    The Court: Sustained. Move to another area.

2    Mr. Selvin: This is highly improper, Your Honor.

3    [Prosecution]: Oh, it's highly proper, but the court has ruled and I
     accept that.
4
     The Court: All right. That's fine. The objection is sustained.
5    There's been no answer to the question. The question is to go out.
     The jury is to disregard it. Let's proceed.
6
(30 RT 6718–20.) Petitioner argues the prosecutor's hypothetical question to Dr. Kormos
7
constituted prejudicial misconduct because it filled in the redacted line for the jury and was
8
an improper attempt to bring in excluded evidence (First Rd. Br. at 125).
9
        The California Supreme Court denied this claim finding no prejudice because no
10
evidence of a plan or attempt to kill a police officer was introduced; the court sustained the
11
objection, the prosecutor did not complete the question, and the witness did not answer the
12
question; and the court instructed the jury to disregard the question. *Stevens*, 41 Cal. 4th at 208.
13
Petitioner argues that this denial fails to take into the redacted line on the envelope, which
14
appeared as a visible gap to jurors. He asserts that, contrary to the state court's decision, that
15
jurors would and mostly likely did have an "idea what point [the prosecutor] was trying to
16
make." *Ibid.*
17
        Petitioner's speculative argument that the jurors intuitively filled in the gap on the
18
envelope, based in part on a vague comment written on a juror's blog years after the trial,
19
does not show that the California Supreme Court denial of this claim was unreasonable.
20
The objectively unreasonable standard is not a clear error standard. *Lockyer v. Andrade*,
21
538 U.S. 63, 75–76 (2003). Even "a strong case for relief does not mean the state court's
22
contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102. As noted by the state
23
court, the prosecution presented no evidence that petitioner engaged in any plan or attempt to
24
murder a police officer. Moreover, ample evidence supported petitioner's conviction. He, thus,
25
cannot show that the prosecutor's improper statement had a "substantial and injurious effect or
26
influence in determining the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 637
27
(1993). Accordingly, this subclaim is DENIED.
28
                    **D.    Cumulative Impact.**

28

1    Finally, petitioner asserts that the "prosecutor's misconduct in this case was so pervasive,

2    that even . . . [if] the individual instances of misconduct do not warrant relief," cumulatively they

3    warrant reversal (First Rd. Br. at 127).  In some cases, although no single trial error is

4    sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still

5    prejudice a defendant so much that his conviction must be overturned.  *See Alcala v. Woodford*,

6    334 F.3d 862, 893–95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors

7    hindered defendant's efforts to challenge every important element of proof offered by

8    prosecution).  However, there can be no cumulative error when there has not been more than one

9    error.  *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012).  Here, only the prosecutor's

10   accusation that defense counsel lied constituted error.  Thus, petitioner has not shown an

11   entitlement to relief.  This subclaim is **DENIED**.

12                    **E.      Ineffective Assistance of Trial Counsel.**

13   Claim 18 challenges trial counsel's failure to respond effectively to the above-referenced

14   incidents of misconduct.  Respondent notes that petitioner's claim presents either unexhausted

15   subclaims or new evidence that amends the claim (First Rd. Opp. at 22).  Since relief may be

16   denied even if the claim is unexhausted, all issues raised by petitioner will be addressed.  The

17   court may deny a habeas petition on the merits even if it is unexhausted.  *See Runningeagle v.*

18   *Ryan*, 686 F.3d 758, 777 n.10 (9th Cir. 2012).

19   As discussed above, to prevail on a claim of ineffective assistance of trial counsel,

20   petitioner must show both that his attorneys rendered deficient performance and that such

21   representation prejudiced him.  *Strickland*, 466 U.S. at 687–88, 694.

22                        *(i)      Victim Impact Evidence.*

23   For this subclaim, petitioner argues that, following a detailed conference wherein the

24   trial court outlined the parameters for the introduction of victim impact evidence, including

25   specific rulings, the prosecutor regularly abridged those rulings.  He states, "[T]rial counsel

26   had to repeatedly object to testimony that strayed into the areas verboten by the court, and the

27   court did little more than tell the prosecution to move along each time. (First Rd. Br. at 134).

28   Petitioner notes that on most occasions, trial counsel objected.  He argues, though, that counsel

should have been more forceful in requesting admonitions (*see*, *e.g.*, First Rd. Br. at 136, 138) and suggests that counsel may not have been as strong as needed because knew the prosecutor from having worked with him years before (*id.* at 139).  He, then, undercuts his own argument by discussing the motion for mistrial counsel filed in response to victim impact evidence (*ibid.*).

As discussed in the order granting respondent's motion to dismiss the related prosecutorial misconduct subclaim, petitioner's trial counsel clearly stated at various points that their choices were based on trial strategy, particularly in regards to the instance of Noyer's mother kissing her daughter's photograph.  After the defense moved for a mistrial, petitioner's attorney and the prosecutor entered into a lengthy discussion about the witness's taking the photograph and kissing it (29 RT 6499–6505).  Petitioner's attorney, in setting out the problem for the court, said, "Now, understand, I'm put into the position, obviously — I cannot obviously in this position yell, 'Objection'; okay?  Anything I say at that particular point, anything I say to the jury is negative, you know, would provoke a negative response" (29 RT 6500–01). This statement evinces a clear trial strategy not to object during an emotionally charged situation because of concern that it might be poorly received by the jury and that strategy likely applied to the other incidents where petitioner feels counsel responded too softly to the prosecutor's infringements on the trial court's orders regarding victim impact evidence.  A difference of opinion as to trial tactics does not constitute denial of effective assistance, *see United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available.  *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir.), cert. denied, 469 U.S. 838 (1984).

Tactical decisions of trial counsel deserve deference when:  (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances.  *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  Whether counsel's actions were indeed tactical is a question of fact considered under 28 U.S.C. § 2254(d)(2); whether those actions were reasonable is a question of law considered under 28 U.S.C. § 2254(d)(1).  *Edwards v. LaMarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).

Ultimately, it is petitioner's responsibility to show through evidentiary proof that counsel's performance was deficient. See *Toomey v. Bunnell*, 898 F.2d 741, 743 (9th Cir. 1990), *cert. denied*, 498 U.S. 960 (1990). Our court of appeals addressed this requirement, stating:

> [T]he focus is upon the reason why the attorney did not object. Ordinarily, an attorney will fail to make an objection for one of two reasons: either he or she makes a strategic decision not to object, or he or she fails to object because of inadvertence of ignorance of the law."

*Garrison v. McCarthy*, 653 F.2d 374, 378 (9th Cir. 1981). The record of objections shows that trial counsel struggled with balancing objecting to the prosecutor and alienating the jury in a difficult capital case. Counsel knew the law and chose not to object or request admonitions as a matter of strategy. Accordingly, petitioner has not shown that the California Supreme Court unreasonably denied this claim by failing to find deficient performance. This subclaim is **DENIED**.

### (ii)    *"Scorecard" Statement.*

Petitioner next challenges counsel's failure to seek an admonition of the prosecutor following his attempt to question Dr. Kormos about the possibility of petitioner wanting to kill a police officer. He argues this ineffectiveness left the jury believing he wanted to commit the crime (First Rd. Br. at 140). He does not, however, state what more counsel could have requested to ameliorate the situation. Both attorneys objected and Attorney Selvin called the question "highly improper" (30 RT 6718–20). The trial court did admonish the jury not to consider the question. He has not shown that counsel failed to function as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. This subclaim is **DENIED**.

### (iii)    *Conflating Liability for Penalty.*

Petitioner recognizes that counsel objected when during his closing argument during the guilt phase the prosecutor addressed the possibility of penalty. He argues that counsel failed, however, to request in front of the jury that the trial court cite the prosecutor for misconduct and that such failure constitutes ineffective assistance (First Rd. Br. at 141). He falls far short of the *Strickland* standard both on the deficient performance and prejudice prongs. Counsel objected

and the trial court admonished the jury not to consider the remark.  He has not even attempted to show that counsel's decision not to request a further admonition prejudiced him.  This subclaim is **DENIED.**

### *(iv)*    *Other Moments of Misconduct.*

Without providing further specifics, petitioner argues:

The prosecutor misstated the evidence, made comments demeaning trial counsel, and propounded outright falsehoods. Each of these actions alone and in concert violated Petitioner's federal constitutional rights by infecting the trial with enough unfairness as to make the resulting conviction a denial of due process. The prosecutor's bad faith existed on both global and specific issues. For instance, twice having failed to get the court to admit the excluded line of the "scorecard," the prosecutor asked Dr. Kormos a question designed to place that excluded evidence before the jury. The bad faith behind that action is obvious.  Unfortunately, trial counsel unreasonably failed to object on the proper basis to many of the multiple acts of prosecutorial misconduct, repeatedly failed to request admonitions, and failed to request that the prosecutor be cited for misconduct in front of the jury. Trial counsel had no reasonable tactical purpose for failing to object to the repeated acts of prosecutorial misconduct and Petitioner has been prejudiced by trial counsel's failures because it is reasonably probable that had trial counsel acted as diligent advocates, the trial court would have sustained many of the objections, admonished the jury, and cited the prosecutor for misconduct in front of the jury.

(First Rd. Br. at 141).  As discussed in connection with the specific instances of alleged prosecutorial misconduct addressed in connection with Claims 4 and 5, counsel did object — repeatedly.  Counsel requested admonitions.  Trial counsel elucidated a strategy of treading lightly during certain portions of the proceedings so as not to turn the jurors against petitioner. Petitioner has not shown any individual or cumulative error by counsel that would have prejudiced him.  This subclaim is, therefore, **DENIED**.

### 4.    **CLAIM 6.**

Claim 6 argues that the prosecutor committed misconduct when he knowingly introduced false and unreliable statements by codefendant Clark (First Rd. Br. at 122).  Respondent

previously asserted, as he does now, that petitioner defaulted this claim in state court (First Rd. Opp. at 21).  The California Supreme Court held that petitioner had defaulted his claim because he failed to present it on appeal and cited to *In re Dixon*, 41 Cal.2d 756, 759 (1953).

In an order adjudicating the procedural default allegations, Claim 6 was previously found not to be defaulted because the Ninth Circuit found the *Dixon* bar inadequate. Order Granting in Part Motion to Find Claims Procedurally Defaulted, Dkt. 126, at 18.  Subsequent to the issuance of that decision, the Supreme Court determined that California's *Dixon* bar is adequate. *See Johnson v. Lee*, __ U.S. __, 136 S.Ct. 1802, 1806–1807 (2016).

In his brief opposing the motion to find the claim procedurally defaulted, petitioner failed to articulate any cause to excuse the default.  He argued that the Court had discretion to hear the claim and that it would be unfair to dismiss it on procedural grounds because it had been briefed on the merits in state court.  Opp. to Mot. to Find Claims Proc. Def., Dkt. 111, at 9.  He failed to address the claim at all in his reply.  For the reasons set forth in the order granting in part the motion to dismiss based on procedural default, petitioner has not shown that imposition of the procedural bar would result in a fundamental miscarriage of justice.  Order Granting in Part Mot. to Find Claims Proc. Def. at 13, 16.  For these reasons, he cannot overcome the imposition of the state procedural bar and this claim must be **DISMISSED** from the petition.

### 5.    CLAIMS 7, 8, 9, AND 10.

Petitioner's final four claims allege the ineffective assistance of trial counsel in a variety of ways.  All four relate to trial counsel's approach to codefendant Clark's testimony.  Claim 7 argues that trial counsel rendered ineffective assistance by failing to move to sever petitioner's trial from co-defendant Clark's on the ground that the two defendants presented antagonistic defenses.  Claim 8 alleges that trial counsel rendered ineffective assistance by failing to object to the introduction of Clark's statements to the police.  Claim 9 challenges trial counsel's withdrawal of the request that accomplice instructions be given to the jury.  Finally, Claim 10 argues that trial counsel failed to object to improper opinion testimony by Sergeant Roth when he said that Clark's statement "rang true."  To show that he is entitled to relief on any of these claims concerning codefendant Clark's testimony, petitioner must show that the California

Supreme Court's denial of the claims was unreasonable and that counsel's errors, assuming they rose to such a level, deprived him of a fair trial, which is a trial whose result is reliable. *Strickland*, 466 U.S. at 688. He cannot do so.

The prosecutor's office charged codefendant Clark with the Noyer murder. Clark, however, testified as to his knowledge of both the Noyer and Rochon murders. The jury convicted petitioner of four murders in total, with a lying-in-wait special circumstance allegation attached to the Paul Fenn murder, as well as a multiple-murder special circumstance. Even if counsel had performed the acts petitioner now argues they should have, and even if the jury acquitted him of one or both of the murders to which Clark testified, he still would have been convicted of two murders, at least the lying-in-wait special circumstance, and six attempted murders. He still would have been eligible for the death penalty. And he cannot show that if he had not been convicted of the Noyer and Rochon murders that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is one that undermines confidence in the outcome. *Ibid.* "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster*, 563 U.S. at 189 (citation omitted). He has not made such a showing. Accordingly, these claims are **DENIED**.

### CONCLUSION

Petitioner's motions to exceed the page limits for his opening and reply briefs for both rounds of briefing are **GRANTED**.

For the foregoing reasons, Claims 2, 3, 4, 5, 7, 8, 9, 10 and 18 are **DENIED**.

Claim 6 is **DISMISSED** as procedurally defaulted.

Petitioner filed a motion seeking a stay of the third round of briefing. That motion is **DENIED**. Petitioner's counsel note that they have not begun drafting the opening brief for the third round of claims and cite heavy workloads. Good cause appearing therefor, the Court hereby **GRANTS** a two-week extension of time in which to file an opening brief. The following

briefing schedule now applies: the opening brief is due on or before February 21, 2018; the

answer is due on or before April 6; and the reply is due on or before April 20.

**IT IS SO ORDERED.**

Dated:  February 1, 2018.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE