IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHARLES STEVENS,

        Petitioner,

   v.

RON DAVIS, Warden,
San Quentin State Prison,

        Respondent.

_____/

No. C 09-00137 WHA

<u>DEATH PENALTY CASE</u>

**ORDER DENYING CLAIMS
AND GRANTING MOTION TO
FILE RESPONSE UNDER SEAL**

Re: Dkt. Nos. 162, 172

**INTRODUCTION**

A jury convicted petitioner, Charles Stevens, in 1981 of, inter alia, four counts of murder and six counts of attempted murder (Cal. Penal Code 187(a)), accompanied by a lying-in-wait special circumstance (Section 190.2 (a)(15)) as to one murder and a multiple-murder special circumstance (Section 190.2(a)(3)). Through counsel, petitioner filed a petition for writ of habeas corpus under Section 2254 raising twenty-eight claims for relief. He subsequently dismissed eight of those claims. An additional round of claims, four of the subclaims within Claim 5 and all of Claim 23, were dismissed on procedural default grounds. Subsequently, nine claims were denied and an additional claim was dismissed as procedurally defaulted. The parties have now briefed the remaining claims in the petition. Claims 1, 11, 12, 15, 16, 21, 24, 25 and 28 are **Denied** for the following reasons. Additionally, petitioner's counsel's motion to file under seal their response to the order requesting a response on petitioner's pro se letters is **Granted**.

**STATEMENT**

Petitioner is a condemned inmate at San Quentin State Prison. Between April 3 and July 27, 1989, petitioner shot at victims on or near Interstate 580 in Oakland. All of them, save for one, were inside a car at the time of the attack. Petitioner killed four people: Leslie Ann Noyer, Lori Anne Rochon, Laquann Sloan, and Raymond August. He attempted to murder an additional six people: Karen Alice Anderson, Janelle Lee, Julia Peters, Paul Fenn, Upendra de Silva, and Rodney Stokes. Prosecutors charged petitioner as to all the offenses and charged a co-defendant, Richard Clark, as to Noyer's murder. Clark testified in his own defense. The jury deadlocked on the murder charge against Clark and the trial court declared a mistrial. It convicted petitioner of all charges and sentenced him to death. The facts adduced at trial follow.

Ballistics evidence connected petitioner's Desert Eagle firearm as either a direct match or consistent with the weapon used in all of the shootings except for the attempted murder of Stokes.

In the early morning of April 3, 1989, police responded to a call regarding gunshots and found Leslie Noyer lying on the ground in front of a Mazda RX7 with its doors open and the engine running. Noyer had been shot in the head. Police found shell casings and an unexpended copper-jacket bullet near the vehicle. A palm print retrieved from the door below the passenger side window matched petitioner and two other prints matched co-defendant Clark. The found casings matched petitioner's gun, when it was eventually recovered.

On June 7, a little after 2:00 a.m., Karen Anderson drove herself and her friend Janelle Lee home. As Anderson turned a corner on the way home, Lee saw a man with his arms raised and pointing at them, though she did not see anything in his hands. The man shot at them, shattering the passenger window. He did not hit either of them. When Anderson had the window repaired, the repair person found shell casings, which he gave to her. Those casings also eventually matched petitioner's Desert Eagle.

Laquann Sloan was shot in the head around 11:45 p.m. on June 8. Police found three shell casings that matched petitioner's gun.

On July 6, Highway Patrol officers found Lori Rochon slumped over her seat on the side of Interstate 580 near the Grand Avenue exit in Oakland. She had been shot one time. A police search of the area did not yield any casings. The police criminalist who examined the casings from all of the crimes said that the one found inside Rochon was consistent with a Desert Eagle. He noted that the slug contained polygonal rifling, which the other casings from the other crimes did as well. No other casings the Oakland Police Department had found in the past five years had such rifling.

Around 3:00 a.m. on July 16, Paul Fenn drove his friends Julie Peters and John Cutler eastbound on Interstate 580 near the Harrison Street exit. He intended to move into the right-hand lane and had noticed the headlights of another car there. When he looked to see if he was clear to move over, the headlights had disappeared and he could not see them anywhere. A pop sounded immediately to the right of the car and the right panel of the front windshield exploded. Other windows then shattered. The other car, a small, white sedan, waited about three seconds and then took off at high speed. Ten months later, Fenn found slugs and a copper bullet jacket in the van. They were consistent with a .38 or .357 Desert Eagle.

Later on July 16, Dr. Upendra De Silva was driving on Oakland Avenue after having exited Interstate 580. As he approached the top of the hill, he heard and felt the glass in his car shattering. He ducked down after recognizing the sound of gunfire. When he resurfaced several seconds later, he saw the taillights of a car in the right lane about 25–50 yards ahead. He got out, walked to a nearby apartment building, and asked someone to call the police. De Silva sustained injuries from the shattered glass and was shot in his right elbow. Police did not recover any casings there. The next day, however, police investigated a similar shooting one block away from where De Silva had been shot and one mile away from the Rochon murder. A casing found there matched petitioner's gun, when it was eventually recovered.

Police apprehended petitioner across the highway from the scene of the final murder. On July 27, at 1:15 a.m., petitioner, driving a white Mazda, pulled alongside Rodney Stokes, who was driving home from work on Interstate 580. Petitioner drove at approximately forty-five miles per hour. Both vehicles slowed. Stokes tried to discern if he knew the other

1   driver.  Co-workers often motioned to Stokes on the freeway and chatted with him.

2   Petitioner motioned to get Stokes' attention and then smiled at him.  Stokes realized he did not

3   know petitioner but tried to see if petitioner might have a passenger that Stokes did know.

4   Petitioner then shot at him.

5   　　　Stokes tried to avoid petitioner's attention by turning off his headlights, laying down

6   on the seat, and slowing to about thirty miles per hour.  He lost control of the car, but regained

7   control shortly thereafter.  When he looked up, he saw petitioner coasting in front of him,

8   seemingly waiting.  Petitioner fired two more shots.  Petitioner then pulled away from Stokes,

9   who began flashing his headlights to attract police attention.  He sped up to try to stay with

10  petitioner.  They were approximately three-quarters of a mile away from the 35th Avenue

11  overpass in Oakland.

12  　　　Stokes saw petitioner slow down and pull alongside another car, one driven by

13  Raymond August.  Petitioner got August's attention and both sets of brake lights came on.

14  As the cars rounded a bend, Stokes lost sight of the cars briefly.  When he again spotted them,

15  he heard at least two gunshots.  Petitioner exited the freeway at the 35th Avenue off-ramp,

16  drove over the freeway, and then took the onramp heading the opposite direction on Interstate

17  580.  Petitioner parked on the shoulder.

18  　　　August's car crashed into a pillar under the 35th Avenue overpass.  Stokes pulled up

19  behind August's car.  He checked on August, who was covered in "[a]n awful lot of blood,"

20  and then saw petitioner's Mazda parked on the other side of the freeway.  Stokes called 911.

21  The police arrived and Stokes pointed out where petitioner was still parked.  An officer drove

22  over and ordered petitioner out of the car.  Petitioner initially appeared startled and began to

23  drive away.  He got out of the car with his hands in the air, walked backwards, then fled on foot

24  toward a retaining wall.  The officer grabbed petitioner at the wall and heard a heavy metallic

25  object hit the ground.  The officer then retrieved petitioner's loaded .357 magnum Desert Eagle

26  semiautomatic pistol, which petitioner later told police he'd obtained three or four months

27  earlier in "[a]bout . . . March.  A search of petitioner yielded a loaded magazine and a loose

28  bullet.  This seizure allowed the police to connect the firearm to the prior murders.

Stokes identified petitioner at the scene. The ammunition fragment recovered from Stokes' car was insufficient to make any comparison.

Police searched petitioner's room and found "an operator's manual for the weapon, a canvas gun case, gun cleaning equipment, a .357 magnum cartridge and magazine, trays of bullets, and practice targets." Additionally, they found a collection of articles about the shootings and "an envelope with handwritten references to what appeared to be various Penal and Vehicle Code sections including those regarding murder, assault, vehicle theft, and weapons offenses." Petitioner's palm print was found on Noyer's car.

The police interviewed petitioner. They asked him how a person who committed the crimes would get caught and petitioner replied, "The guy would get caught if somebody told on him or if he pulled over like I did."

During the guilt phase of trial, petitioner only presented evidence as to the Sloan murder. The victim, a 16-year-old, had been shot in the head. The three witnesses who testified did not see the actual shooting, though they had been present either right before or right after. Co-defendant Clark testified as to the Noyer and Rochon murders. Clark had made multiple statements to the police regarding the Noyer murder. His story changed with each version. In his last statement, he said that he had shot Noyer because petitioner had threatened to shoot him if he did not. At trial, Clark once again changed his story, this time saying he was not present at the Noyer murder scene. Clark explained the variances in his accounts by saying he was afraid of petitioner and made up his statements using details from the police.

Clark also testified as to the Rochon murder. He said that early on the morning of July 6, while driving a stolen car with Clark as the passenger, petitioner started rocking back and forth, and said, "'Man, I got to shoot somebody.'" Petitioner then pulled alongside a car. Clark asked why he was going to shoot this person and petitioner said, "Okay. I'm not going to shoot this guy. I'll shoot somebody white." Petitioner then pulled alongside Lori Rochon's car, rolled down his side window, and shot at her. He told Clark he thought Rochon was a "white dude," and fired at her.

Clark's sister also testified. She said that in July 1989, Clark asked her to tell him when the news came on because petitioner had shot someone on the freeway. The news covered the shooting, identifying the victim as "Lori" and noting that she was shot on Interstate 580. Clark said that when he saw a July 18 article about the assaults on Fenn, Peters, and de Silva, he called petitioner and asked if petitioner had shot them. Petitioner said, "Man, don't say that over the phone."

At the penalty phase, the parties stipulated that petitioner incurred a conviction in 1989 for three counts of felony auto theft.

Randall Shumpert testified to an incident in June 1987, wherein petitioner drove by a BART station where Shumpert stood at 10:00 p.m. The passenger in petitioner's car yelled at Shumpert and an angry exchange took place. Petitioner drove away, then returned a few minutes later with his headlights off, and shot at Shumpert through the car window. Petitioner then left.

The trial court received testimony regarding a 1988 incident wherein petitioner threw a carton of milk at a correctional officer in the county jail and encouraged other inmates to do so. In another incident, a sheriff's deputy overheard a threat that petitioner made against co-defendant Clark during transit to the courthouse in March 1993. Petitioner said he would kill Clark for snitching.

Eight witnesses provided victim impact testimony regarding the accomplishments of their loved ones, and the effect of the murders on their own lives.

Petitioner's expert, psychiatrist Harry Kormos, testified about the conditions of petitioner's childhood and the results of psychological testing petitioner underwent. After ten meetings, each of which lasted for three hours, over a period of four to five months, Dr. Kormos concluded that petitioner had an unspecified personality disorder with schizoid and borderline personality traits. Dr. Kormos could not recall any of the several dozen people had diagnosed with the same disorder as having committed murder.

Dr. Kormos stated that petitioner did not have a mental illness and that all of the testing revealed no organic brain damage, illness, tumors, or malformations. He concluded that

petitioner did not suffer from fetal alcohol syndrome because petitioner's mother had stopped drinking five years before she had petitioner. Petitioner's intelligence quotient of eighty to ninety indicated below-average intelligence and he did have to repeat the ninth grade due for academic reasons; however, Dr. Kormos did not believe petitioner had an intellectual disability. During childhood, petitioner suffered several seizures. A childhood EEG showed an abnormality. Another EEG in 1993 showed no abnormalities.

Dr. Kormos also testified to the difficulty petitioner's mixed racial heritage could cause. Petitioner's mother was Native American, and his father Caucasian and Black. Petitioner had reported a good early childhood to Dr. Kormos. He said that he had been cared for by his parents in Oakland until he was about twelve years old. His mother devoutly practiced her faith as a Jehovah's Witness and he attended church with her. When he was twelve, though, that changed following a move with his mother and older sister to a reservation on the Nevada border.

Petitioner's mother resumed drinking. She stopped church and became verbally and physically violent. Police arrested her for child abuse for beating petitioner's older sister. Petitioner reported that he attempted suicide twice in a few days to get his mother's attention. He provided no medical records regarding the attempts and bore no scars, although he said he cut his wrists in the second attempt.

Petitioner's family returned to Oakland approximately a year later. Petitioner's mother obtained several arrests for drunk driving and spent a year in jail. She later threatened to throw petitioner out of a window and kill his sister. She was committed to Highland Hospital. She continued heavily drinking until her alcoholism resulted her death in March 1986 in front of petitioner.

Petitioner's brother, who was seventeen years older than petitioner, was convicted of murder in 1978. Dr. Kormos did not believe this to be emotionally relevant to petitioner because of the age difference and petitioner had not reported a close relationship with his brother.

Petitioner received two suspensions in middle school for disruptive behavior. He said he did not use drugs, though he tried marijuana when he was twelve and sold cocaine in high school to get money for clothes and jewelry. Petitioner stole a gun from a pawnshop where he worked and was fired for it.

Dr. Kormos said that petitioner could act altruistically and noted petitioner's care for his father as an example. In his youth, petitioner did attain some achievement when he won several trophies for bike racing.

Dr. Kormos said he could not "come up with a clear diagnosis as to why" petitioner murdered four people and attempted to kill six others. Petitioner never denied having committed the shootings, though he said he could not remember having done most of them. He did have "a patchy recollection of the August killing." Dr. Kormos thought that petitioner must have wanted, at least on some level, to be caught. He did not believe petitioner derived pleasure or satisfaction from the killings.

Jerry Enomoto, a former Director of the Department of Corrections, testified that petitioner, at most, would pose a nuisance in prison and would not be a danger to other inmates or staff. Three deputy sheriffs testified regarding petitioner's good behavior in jail, although one noted that petitioner had lost a job assignment for misconduct. *See People v. Stevens*, 41 Cal.4th 182, 187–192 (2007).

\*             \*             \*

The California Supreme Court affirmed petitioner's conviction and sentence on direct appeal on June 4, 2007. *Stevens*, 41 Ca1.4th at 1168. On January 7, 2008, the United States Supreme Court denied a petition for certiorari. *Stevens v. California*, 552 U.S. 1118 (2008).

On December 1, 2008, petitioner initiated the present habeas corpus action. That document was received on January 12, 2009. Counsel for petitioner, Robert Bryan and Mark Eibert, were appointed three years later. Through those appointed counsel, petitioner filed his Amended Petition for Writ of Habeas Corpus on May 21, 2014, asserting 28 claims. After a round of briefing and careful review and consideration, the Court granted petitioner's motion to withdraw eight of those claims from his petition (Dkt. No. 109).

Respondent filed a motion to dismiss a portion of Claim 5 and all of Claim 6 and Claim 23 on procedural default grounds (Dkt. No. 107). Petitioner failed to show cause and prejudice justice to excuse the default or that imposition of the procedural bar would result in a fundamental miscarriage. The four challenged subclaims of Claim 5 and Claim 23 were dismissed (Dkt. No. 126).

Lead counsel Robert Bryan moved to be removed from the case and that motion was granted (Dkt. No. 132). Attorneys Brian Pomerantz and Richard Tamor took over the case (Dkt No. 134). Petitioner previously briefed two rounds of merits claims, which were denied, except for Claims 1 and 12, which were deferred. Petitioner now has briefed all remaining claims in the petition.

**ANALYSIS**

Following enactment of the Antiterrorist and Effective Death Penalty Act of 1996 (AEDPA), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of Section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision unreasonably applies Supreme Court authority as articulated in the second clause of Section 2254(d)(1) if it correctly identifies the

governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "As a condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 102.

A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340.

A district court must limit its review to the record that was before the state court that adjudicated the claim on the merits unless a petitioner can show the state court's decision to be unreasonable under 2254 Section (d)(1) or (d)(2). *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011).

## 1. CLAIMS 1 AND 12.

Claim 1 argues that the prosecutor impermissibly dismissed venire members based on racial bias. Claim 1A focuses on the dismissal of potential African American jurors and claim 1B addresses the dismissal of potential Jewish jurors. Claim 12 argues that trial counsel rendered ineffective assistance by failing to submit a comparative juror analysis to the trial court. These errors, petitioner argues, violated his rights to the effective assistance of counsel; to a fair trial and an impartial jury; to a reliable special circumstance determination; to reasonable access to the courts; to confrontation; to present a defense; to freedom from cruel

and/or unusual punishment; to a reliable penalty determination; to a reliable, accurate, non-arbitrary guilt and penalty determination; and to equal protection of the law and due process of law, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments (Sec. Am. Pet. at 35, 155).

### A.    Exclusion of African American Jurors.

This claim challenges the prosecution's dismissal of seven out of eight African American venire members.  Petitioner argues that these dismissals violated the strictures against the elimination of jury venire members on the basis of racial bias as set out in *Batson v. Kentucky*, 476 U.S. 79 (1986).  The California Supreme Court denied this claim on direct appeal.

### (i)    *Background.*

During voir dire, the defense attorneys for both petitioner and co-defendant Clark made a collective four motions challenging the prosecution's dismissal of seven African American venire members pursuant to *People v. Wheeler*, 22 Cal.3d 258 (1978), the California analog to *Batson*.  The first motion challenged the dismissal of potential jurors Henry Hill, Larry Foster, Jean Clemons, and Walter Simpson (14 RT 2864).  The second motion concerned the dismissal of Patricia King (14 RT 2882).  The third addressed the dismissal of Alice McCall (14 RT 2888) and the final motion covered the dismissal of Joyce Gray (14 RT 2895).  For all of the challenges, the trial court either expressly or impliedly found that the defense had established a prima facie case of discrimination and asked the prosecutor to explain his reasons for using the peremptory challenges.  Each time, the trial court seemed satisfied with the prosecutor's assertions and found that the petitioner and Clark had not proven purposeful discrimination and allowed jury selection to continue (*see*, *e.g.*, 14 RT 2877, 2885, 2893–94, 2896).

### (ii)    *Petitioner Failed to Plead Properly the Entirety of His Claim in the State Court.*

The California Supreme Court denied this claim on direct appeal.  It found that petitioner's appellate brief only challenged the denial of the first *Wheeler* motion.  It framed petitioner's argument on appeal as, "[D]efendant asserts the prosecutor's reasons for challenging Prospective Jurors L.F., H.H., and J.C., all of whom were involved in the first

11

1    *Wheeler* motion, were not supported by the record, and that the trial court erred in failing to

2    question the prosecutor about these discrepancies." *Stevens*, 41 Cal.4th at 193.  The California

3    Supreme Court then engaged in a comparative juror analysis as to dismissed venire members

4    Hill, Foster, and Clemons.  It made no mention of dismissed venire member Simpson, who was

5    also covered by the first motion.  The California Supreme Court determined that petitioner had

6    not shown entitlement to relief because the comparative juror analysis did not reveal "such [a]

7    striking similarity [between dismissed venire members and seated jurors] that pretext is

8    evident."  *Id.* at 198.  The court noted that it deferred to the trial court's credibility

9    determinations and that the trial court stated it relied, in part, on its own "observations" in

10   finding no purposeful discrimination.  *Ibid.*

11       A federal habeas court may grant the writ if it concludes that the state courts

12   adjudication of the claim "resulted in a decision that was based on an unreasonable

13   determination of the facts in light of the evidence presented in the State court proceeding."

14   28 U.S.C. § 2254(d)(2).  The relevant question under Section 2254(d)(2) is whether an appellate

15   panel, applying the normal standards of appellate review, could reasonably conclude that the

16   state court findings are supported by the record.  *Lambert v. Blodgett*, 393 F.3d 943, 978

17   (9th Cir. 2004).  Petitioner argues that the record does not support the state court's findings in

18   two ways:  (1) the California Supreme Court stated that petitioner's claim only addressed the

19   first *Wheeler* motion made in the trial court, and (2) in the analysis of that first motion, the

20   California Supreme Court failed to analyze the prosecution's dismissal of Walter Simpson.

21       The proper question is not whether the California Supreme Court overlooked the other

22   claims, but whether petitioner properly pleaded them.  His appellate brief included a lengthy

23   factual background detailing all four *Wheeler* motions and some of the answers the dismissed

24   venire members provided (AG022830–42).  However, his argument section only includes

25   arguments as to Foster, Hill, and Clemons (AG022843–51).  By not making specific argument

26   as to Simpson and the remaining jurors, petitioner failed to present properly those claims to the

27   California Supreme Court.  Because petitioner did not do so, he failed to exhaust the claims as

28   to Simpson and the second, third, and fourth *Wheeler* motions.  *See Gulbrandson v. Ryan*,

738 F.3d 976, 993 (9th Cir. 2013), citing *Koerner v. Grigas*, 328 F.3d 1039, 1046-48 (9th Cir. 2003) (a petitioner does not exhaust all possible claims stemming from a common set of facts merely by raising one specific claim). Under Section 2254(b)(1)(A), a district court may not grant the writ unless state court remedies are exhausted. Thus, only the claims properly raised on appeal may be considered.

*(iii)* ***The California Supreme Court Denial Was Reasonable.***

A party establishes a prima facie equal protection violation based on race by showing that: (1) the defendant is a member of a cognizable racial group, (2) the group's members have been excluded from the jury, and (3) the circumstances of the case raise an inference that the exclusion was based on race. *Batson*, 476 U.S. at 96. When a defendant raises a plausible *Batson* claim, a court must analyze the context in which the contested peremptory strike arose. *Boyd v. Newland*, 467 F.3d 1139, 1146–47 (9th Cir. 2006) (citing *Johnson* v. *California*, 545 U.S. 162, 173 (2005)). An appellate court should conduct a comparative juror analysis to assist in determining whether the totality of the circumstances gives rise to an inference of discrimination. *Boyd*, 467 F.3d at 1148–49.

Here, the California Supreme Court conducted the required comparative juror analysis, contrasting responses the excused venire members gave on their questionnaires and during voir dire with those of seated jurors. *See Stevens*, 41 Cal.4th at 193–198. Our court of appeals recently clarified the review process for such claims:

> When we apply th[e] deferential AEDPA standard in the *Batson* context, we end up with a standard of review that is "doubly deferential," *Briggs* [*v. Grounds*], 682 F.3d [1165,] 1170 [(9th Cir. 2012)], because the federal court defers to the state reviewing court's determination of the facts, and the reviewing court defers to the trial court's determination of the prosecutor's credibility. This doubly deferential standard means that "unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it." *Id.* at 1170.
>
> We apply this doubly deferential standard in two steps. *Jamerson v. Runnels*, 713 F.3d 1218, 1225 (9th Cir. 2013). First, because § 2254(d)(2) ultimately requires us to determine whether the state court's decision was "based on an unreasonable determination of the facts in light of the evidence" in the record, we must review the relevant portions of the record and use ordinary analytic tools to evaluate the prosecutor's race-neutral explanations. *Mitleider v.*

13

*Hall*, 391 F.3d 1039, 1046–47 (9th Cir. 2004). We consider whether a prosecutor's justifications are contrary to the evidence in the record, such as being "implausible or fantastic," *Purkett* [*v. Elem*], 514 U.S. [765,] 768 [(1995)], based on mischaracterizations of a prospective juror's testimony, [*Miller-El v. Dretke* ("*Miller–El II*")], 545 U.S. [231], 244 [(2005)], or belied by a comparative juror analysis. Conversely, we consider whether evidence in the record shows that at least some of the prosecutor's reasons were "permissible and plausible." [*Rice v.*] *Collins*, 546 U.S. [333], 341 [(2006)].

Second, having reviewed the prosecutor's explanations in light of the evidence in the record, we turn to the state appellate court's decision. The pertinent question is not whether the prosecutor was credible, or even whether the trial court's conclusion to that effect was clearly erroneous. Rather, the pertinent question is whether the state appellate court was objectively unreasonable in upholding the trial court's determination. Even if we would have reached a different conclusion regarding the prosecutor's credibility, we must give the state appellate court the benefit of the doubt, *Felkner* [*v. Jackson*], 562 U.S. [594,] 598 [(2011)], and may not grant the habeas petition unless the state court's decision was "not merely wrong, but actually unreasonable." *Taylor* [*v. Maddox*], 366 F.3d [992], 999 [(9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014)].

*Sifuentes v. Brazelton*, 825 F.3d 506, 518 (9th Cir. 2016) (reversing district court grant of habeas corpus relief for *Batson* claim).

### *(a)* ***Larry Foster***.

The first step of the analysis does not show the prosecutor's reasons for excusing venire member Foster to hold up. During the *Wheeler* motion hearing, the prosecutor stated Foster "reflected an ambivalence" in his ability to carry out the death penalty and Foster stated he did not know if California should have a death penalty. Foster's answers on voir dire indicate a potential juror both in favor of the death penalty and committed to rendering the verdict most supported by the law.

When the prosecutor asked Foster how he would vote on a ballot initiative regarding whether California should have the death penalty, Foster stated that he would vote in favor because he believed the death penalty served as a deterrent (10 RT 1835). The prosecutor then asked Foster whether he could in fact render a death verdict when actually faced with it. Foster noted that he had previously opposed the death penalty, which he had stated on his questionnaire, but "[i]f the law says [death is] what it is, I can follow the law. . . . If the law says

this man gets the death penalty, this man doesn't, I could do that" (10 RT 1836).  The prosecutor continued questioning by asking Foster if he was the sort of person who could never vote for the death penalty knowing that life without the possibility of parole served as an alternative.  Foster said, "I believe that if the evidence and whatever was presented to me says that he should have had the death penalty, I can determine and I can give what I think . . . is necessary" (10 RT 1837).  Positing a hypothetical, the prosecutor asked Foster if he could cast the twelfth and final vote for the death penalty and Foster responded, "I could if it was called for, I could do that" (10 RT 1838).  The prosecutor concluded by asking if Foster would have an open mind when going in to the penalty phase if he had voted to convict on the charges and Foster said, "My mind would be open until I heard all the evidence, both the penalty and the guilt phase" (10 RT 1840).

Foster remained consistent when questioned by petitioner's trial attorney.  When asked if he would be open to considering a sentence of life without the possibility of parole, Foster said, "Yes, after I heard all the evidence, I could make my decision" (10 RT 1844).  Finally, when asked if he could be the one vote against the death penalty if all other jurors voted for it, Foster said, "I could if I felt strongly enough" (10 RT 1844).

The record belies the prosecutor's statement that Foster "didn't know" how he would vote on a ballot initiative regarding whether California should have a death penalty.  Additionally, all of Foster's answers on voir dire confirmed his belief in the purpose of the death penalty and that he would render the verdict compelled by the relevant law and application of evidence to that law.  Contrary to the prosecutor's assertions, Foster did not express an ambivalence about returning a death verdict.

That, however, does not conclude the analysis.

The second prong of the evaluation compels a denial of federal habeas relief on this claim.  "[T]he pertinent question is whether the state appellate court was objectively unreasonable in upholding the trial court's determination.  Even if we would have reached a different conclusion regarding the prosecutor's credibility, we must give the state appellate court the benefit of the doubt." *Sifuentes*, 825 F.3d at 518.  The "objectively unreasonable" standard is

not a clear error standard. *Lockyer*, 538 U. S. at 75–76. "[A] strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102.

The California Supreme Court noted in its denial of this claim that the trial court not only relied on the prosecutor's proffered reasons for excusing the jurors, but also its own "the court's own observations." *Stevens*, 41 Cal.4th at 198. It cannot be said that its deference to the trial court's credibility determinations "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 101–102. Thus, petitioner has not met his burden as to Foster.

### *(b)* *Jean Clemons*.

When asked to state his reason for dismissing venire member Jean Clemons, the prosecutor stated that, while Clemons said she "thought she could" render a death verdict, she "expressed a lack of conviction in her ability to do it" (10 RT 2867). This lack of conviction, the prosecutor said, gave him considerable concern about whether he could "take the risk" on seating her on the panel (*ibid.*). A review of the record shows the prosecutor's stated reason to not be "implausible or fantastic." *Purkett*, 514 U.S. at 768.

Clemons gave one definitive answer to the prosecutor. At the end of his voir dire questioning, he asked whether she could keep an open mind as to the penalty if the petitioner had been convicted and the case proceeded to a second phase. Clemons said, "Yes. Yes, sir, I can" (7 RT 1367). She hedged in all of her other answers to his questions.

When the prosecutor asked her how she would vote on a ballot initiative for California to retain the death penalty, Clemons said that based on where she was now on the issue, she thought she would vote for it, but added, "I would have to wait until it actually happened before I make up my mind finally" (7 RT 1360–61). When asked whether she could impose the death penalty if the evidence called for it, she said, "I think I could. I do think I could depending on what I heard throughout the trial, the evidence, and everything I had to go on" (7 RT 1362). The prosecutor asked the question again after giving a visual depiction of what the death penalty would involve for petitioner, and Clemons said, "Well, I admit that would be a tough situation to

1    be in. But I would have to believe beyond a reasonable doubt that this person did commit

2    whatever, you know, the crimes. I would then decide at that time. I can't say exactly what I

3    would do until I hear all the circumstances" (7 RT 1363). Finally, when the prosecutor asked if

4    she could render the twelfth vote for the death penalty, Clemons said, "Since you put it like that,

5    it's kind of hard" (7 RT 1365). She followed up by saying, "I really believe I could do it. I

6    believe I could do it" (*ibid.*).

7         These answers do not reflect a firm conviction in either the death penalty itself or in

8    Clemons's ability to impose it should the law support such a verdict. *See Collins*, 546 U.S. at

9    341 (requiring consideration at to whether evidence in the record shows that at least some of

10   the prosecutor's reasons were "permissible and plausible"). As such, petitioner has not met

11   his burden under the first step of the evaluation. Nor, based on this analysis, can it be said that

12   the California Supreme Court's denial as it pertained to Clemons constituted an objectively

13   unreasonable determination. Thus he has not met his burden at the second step either.

14                          *(c)      Henry Hill.*

15        Venire member Hill presents a slightly easier analysis. In addition to citing Hill's

16   ambivalence to impose the death penalty, the prosecutor noted both that Hill identified himself

17   as an alcoholic in his questionnaire and smelled of alcohol during questioning (10 RT 2867).

18   Defense counsel for petitioner and Clark both stated that should have been raised as a dismissal

19   for cause and that they did not smell alcohol on him (10 RT 2870). The trial court, however,

20   accepted this rationale, as well as the prosecutor's statements about Hill's physical demeanor and

21   evasive nature during voir dire. The trial court was in the best position to judge the credibility of

22   those statements. Accordingly, petitioner has not shown that he met his burden for either step in

23   the analysis.

24        For all of the foregoing reasons, this claim is **DENIED**.

25              **B.      Exclusion of Jewish Jurors.**

26        This claim challenges the prosecutor's exclusion of four venire persons who "identified

27   themselves as Jewish, or referenced membership in a Jewish organization" (First Rd. Merits Br.

28

at 70). It also cites the dismissal of an additional two jurors who, while not identifying as Jewish, had Jewish surnames.

Respondent argues that the claim cannot be considered for several reasons: (1) the claim is not included in the petition, (2) it rests improperly on documents outside the state record, (3) it is barred by the statute of limitations, and (4) petitioner failed to exhaust the claim in state court (First Rd. Opp. at 4[1]). Petitioner argues that the Jewish jurors component of the *Batson* claim need not be viewed as a new claim (First Rd. Reply at 1). He also notes that counsel have "grave concerns" about the Second Amended Petition and ask that if the claim be determined to be independent and in need of exhaustion, that he be allowed to file a Third Amended Complaint and return to the state court to exhaust it (*id.* at 1–2).

Petitioner argues that this does not constitute a new claim because "there is already a claim in the petition that the prosecution was striking potential jurors based on group bias" and the exclusion of Jewish jurors component "is just further evidence, contained within the record, that such bias existed and was motivating the prosecution's strike pattern in a constitutionally impermissible way" (First Rd. Merits Br. at 102). Habeas corpus petitions must meet heightened pleading requirements. *McFarland v. Scott*, 512 U.S. 849, 856 (1994). An application for a federal writ of habeas corpus filed by a prisoner who is in state custody pursuant to a judgment of a state court must "specify all the grounds for relief which are available to the petitioner . . . and shall set forth in summary form the facts supporting each of the grounds thus specified." Rule 2(c) of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (emphasis added). "'[N]otice' pleading is not sufficient, for the petition is expected to state facts that point to a 'real possibility of constitutional error.'" Rule 4 Advisory Committee Notes (quoting *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970). Nowhere does the petition mention the prosecution's improper striking of Jewish jurors. Moreover, much of petitioner's argument pertains to evidence outside the trial record, such as statistics regarding the Alameda County District Attorney's rate of striking Jewish jurors at the time of petitioner's trial. The petition includes no

---

[1] This order primarily resolves claims from the third round of merits briefing. However, it also addresses claims 1 and 12 from the first round and addresses issues pertaining to claims 7–10 from the second round. Thus, prior rounds of briefing are denoted as such.

mention of an office-wide and repeated exclusionary practice. It is, thus, a new ground for relief not contained within the petition.

Petitioner requests the opportunity to file a Third Amended Petition. Such a request surfaced for the first time in the reply on the first round of merits briefing. "It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers." *United States ex rel. Giles v. Sardie*, 191 F.Supp.2d 1117, 1127 (C.D. Cal. 2000); *see also State of Nev. v. Watkins*, 914 F.2d 1545, 1560 (9th Cir. 1990) ("[Parties] cannot raise a new issue for the first time in their reply briefs." (citations omitted)). Petitioner indicated in the opening brief that he intended to "stay on task" in that brief and would not address the applicability of procedural default cases to his unexhausted claim unless respondent raised the exhaustion issue (First Rd. Merits Br. at 102). Nowhere, however, did he discuss a Third Amended Petition.

Moreover, as noted by respondent, the statute of limitations in this case has expired. 28 U.S.C. § 2244(d)(1). Petitioner cannot file an amended petition with new claims without first filing a motion to do so. *See Mayle v. Felix*, 545 U.S. 644, 645 (2005) ("Amendments made after the statute of limitations has run relate back to the date of the original pleading if the original and amended pleadings 'ar[i]se out of the conduct, transaction, or occurrence.' Rule 15(c)(2)"). Petitioner must show that "the original and amended petitions state claims that are tied to a common core of operative facts." *Id.* at 664. Petitioner initially filed this brief in June 2017. He has had eighteen months in which to file a proper motion to amend and he has failed to do so.

As it stands, the claim is not contained within the petition, is time-barred, and is unexhausted. Thus, it will not be considered.

### C. Claim 12.

Claim 12 argues that trial counsel rendered ineffective assistance by failing to submit a comparative juror analysis to the trial court at the time defense counsel made the Wheeler motions (First Rd. Merits Br. at 129). Had counsel done this, petitioner argues, counsel would have made an appropriate record and the California Supreme Court would not have deferred to

the trial court's "nonexistent credibility findings" (*id.* at 130). The California Supreme Court denied this claim without comment on state habeas.

As petitioner acknowledges in his petition, at the time of petitioner's trial, the California Supreme Court had disavowed comparative juror analyses. *See People v. Johnson*, 47 Cal.3d 1194, 1220 (1989). To show that his ineffective assistance of counsel claim warrants relief, petitioner must establish that counsel's performance was deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 686, 687–88 (1984). He also must establish that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The reasonableness of counsel's decisions must be measured against the prevailing legal norms at the time counsel represented the defendant. *Compare Bobby v. Van Hook*, 558 U.S. 4, 8–9 (2009) (criticizing the appellate court's reliance on the 2003 American Bar Association Standards as commands rather than guidelines when evaluating defense counsel's performance in a 1985 trial) with *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (citing American Bar Association Standards for Criminal Justice in circulation at time of defendant's trial). Petitioner's trial counsel cannot be deemed to have rendered deficient performance because they failed to present evidence they knew the trial court would not accept.

Petitioner argues that federal law permitted the submission of comparative juror analyses for proving a *Batson* violation (First Rd. Merits Br. at 130). Petitioner supports his supposition by relying on the Supreme Court's decision in *Miller-El II*, *supra*. *Miller-El II* postdates petitioner's criminal trial by more than twenty years. While *Miller-El II* may not have announced a new rule of criminal procedure as it pertained to the submission of comparative juror analyses, the Supreme Court had not previously indicated that such a tool could be useful in proving a *Batson* claim. *See Boyd*, 467 F.3d at 1145 ("*Miller–El II* made clear that comparative juror analysis is an important tool that courts should utilize in assessing *Batson* claims.").

Petitioner cannot show that trial counsel rendered deficient performance according to the prevailing norms in California trial courts at the time of his trial. Thus, he has failed to show that the California Supreme Court denial of this claim constituted an unreasonable application of clearly established federal law or an unreasonable application of the facts to that law. Accordingly, this claim is **DENIED**.

**2.     CLAIM 11.**

Claim 11 argues that trial counsel rendered ineffective assistance in numerous ways regarding the handling of ballistics during the trial. Petitioner cites as specific shortcomings counsel's failure to hire a ballistics expert and failure to "challenge, minimize, or exclude damaging prosecution ballistics evidence." He also argues that trial counsel erred in failing to request testing of the gunshot residue samples taken upon his arrest (Merits Br. at 2).

Respondent argues that petitioner has failed to show that the California Supreme Court's denial of these claims was unreasonable. Respondent also asserts that petitioner's claim regarding counsel's failure to hire an expert to perform gunshot residue tests on the samples taken from petitioner at the time of his arrest is unexhausted and not properly a part of the petition (Opposition at 1). Petitioner offers no meaningful reply (Reply at 1).

**A.     Gunshot Residue Test.**

This claim argues that trial counsel rendered ineffective assistance by failing to submit for testing to a ballistics expert the gunshot residue samples police took from petitioner's hands upon arrest (Merits Br. at 3). As noted by respondent, petitioner failed to exhaust this claim before the California Supreme Court and the claim was not included in the petition. Regardless, petitioner has failed to show that he would be entitled to relief on it.

Testimony at trial established petitioner as the shooter in the Stokes attempted murder and the August murder. Stokes testified that petitioner did not have a passenger in the car (18 RT 4003). When police approached petitioner at the scene, he sat in the driver's seat of the car and appeared to be alone. Upon seeing the police, petitioner fled his vehicle on foot. The Desert Eagle fell out of his pocket (15 RT 3198–3207). Police retrieved the gun and a criminalist later connected it to the August murder.

Once apprehended and questioned, petitioner indicated that he thought his friend Mario Woods had been with him (16 RT 3319–21). Petitioner's statement is the only evidence to indicate someone else may have been involved. No other evidence exists to suggest that petitioner did not commit the two shootings. His equivocal invocation of a third party not present at the scene, without more, cannot establish a reasonable probability that another person committed the shooting and evaded detection by the police and Stokes.

Given the remote possibility that the gunshot residue test would have come up clear on petitioner, he cannot show that trial counsel rendered deficient performance by failing to request a gunshot residue test or that such a failure prejudiced him. *See Strickland*, 466 U.S. at 687–88, 694. Accordingly, the claim is **Denied**.

### B.  Motion in Limine.

This claim challenges as ineffective assistance trial counsel's failure to file a motion in limine to limit Criminalist Lansing Lee's "testimony regarding the basis and methods of comparison" of the ballistics evidence on the ground that such comparison is unreliable (Merits Br. at 7). Petitioner argues that "no generally accepted objective criterion upon which an expert may ground his identification" exists and "no objective guideline" governs an expert's opinion as to what constitutes a match (*id.* at 10). Additionally, he notes that there is no error rate for firearm and toolmark comparison. Thus, he argues that the trial court should have granted a motion to exclude Lee's testimony under *People v. Kelly*, 17 Cal.3d 24 (1976), and *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which governed the admissibility of scientific evidence at the time of petitioner's trial.

Respondent argues that the California Supreme Court reasonably denied this claim because petitioner failed to present the state court with a declaration stating that ballistics no longer met the standard set out in *Kelly* (Opp. at 7). Moreover, respondent notes that nothing required counsel to file a motion that would have been rejected. The California Supreme Court denied this claim on habeas without comment.

Petitioner's arguments focus on the wrong question. Federal habeas review does not require (or even permit) answering the question of whether a firearms comparison could have

22

been performed reliably and objectively when petitioner went to trial. Instead, the underlying question presented is whether petitioner's attorney reasonably determined that such evidence was clearly admissible under *Kelly*, such that he could reasonably determine that a challenge to such evidence would be futile. The ultimate question that must answered is whether the California Supreme Court's decision on the underlying question of futility was reasonable.

To prevail on a claim for ineffective assistance of counsel for failure to file a motion, petitioner must show "that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him." *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999), citing *Kimmelman v. Morrison*, 477 U.S. 365, 373–74 (1986). As noted by respondent, all of the concerns in legal literature that petitioner presents postdate his trial. At the time of petitioner's trial, expert evidence on toolmark and firearm identification evidence was universally admissible. 4 David Faigman et al., Modern Scientific Evidence, The Law and Science of Expert Testimony § 35:1, pages 613–14 (Thomason Reuters/West 2010). Petitioner has not identified any case in which a California trial court excluded firearms identification evidence or other ballistics comparisons on the bases he cites in his motion, and certainly none that existed at the time of his trial. Petitioner, thus, has not shown the viability of a motion in limine to exclude Lee's testimony.

The California Supreme Court reasonably could have concluded that petitioner had not shown an entitlement to relief because he failed to present evidence demonstrating that a motion to exclude the testimony or any other evidentiary challenge would have been successful. Thus, this claim is **DENIED**.

### C.       Failure to Hire Defense Ballistics Expert.

This claim asserts trial counsel rendered deficient performance by failing to hire a ballistics expert to help counsel prepare for cross-examination of the prosecution's expert by challenging the expert's credibility and diminishing the negative impacts of his testimony (Merits Br. at 7). Petitioner argues that trial counsel consulted with ballistics expert Charles

Morton, but then failed to follow up with him or secure his assistance for trial. The California Supreme Court denied this claim on habeas without comment.

As noted above, the concerns the legal community has come to develop regarding ballistics and firearm identification evolved after petitioner's trial. Thus, it is unclear if any expert would have advised trial counsel at the time to cross-examine Lee based on those issues. Moreover, such concerns do not share universal acceptance, nor do they prevent such evidence from being accepted in trial courts.

In light of the generally accepted nature of firearms identification evidence and the dearth of evidence to show that trial counsel could have challenged it successfully, petitioner has not shown that trial counsel rendered ineffective assistance by failing to secure his own ballistics expert to challenge Lee's testimony. Notably, petitioner's only evidence that trial counsel did not consult reasonably with such an expert is Morton's declaration that counsel did not follow up with him and the absence of such an expert testifying at trial. Trial counsel could have decided not to consult further with Morton and, instead, consult another expert.

Trial counsel did garner a concession from Lee that Desert Eagle guns could be purchased in any gun store and the weapon was not, in fact, "rare" (18 RT 3974–75). He also got Lee to confirm that none of the casings or slugs in the Rochon murder affirmatively matched petitioner's Desert Eagle (18 RT 3976–77), or that any slugs from any scene affirmatively matched petitioner's gun (18 RT 3981). Clark's attorney then asked about the level of judgment that comes in to making identification, asking, "Some other examiner might look at that and draw a different conclusion, right?" (18 RT 3985). He followed up by asking Lee who makes a determination about whether test casings match those found at the scene, to which Lee replied, "I do" (18 RT 3988). These questions all address petitioner's major points and do not show an unprepared trial attorney. That Clark's attorney asked two questions does not prejudice petitioner because the questions were asked and answered before the jury.

Petitioner failed to provide the state court with a declaration from any expert stating specific objections that could have been made to Lee's testimony or particular ways in which trial counsel could have curtailed that testimony. Nor does he present a declaration from any

24

expert stating how he or she could have countered Lee's findings if called to the stand. Petitioner's contentions, on their own, are insufficient to demonstrate prejudice. *See Allen*, 395 F.3d at 1002 n. 2; *Grisby*, 130 F.3d at 373.

Petitioner's counsel chose to pursue a defense that petitioner's Desert Eagle floated between people and that the removable bolt that had made the definitive markings also could have floated between guns (*see*, *e.g.*, RT 3978–3979, 5701–03, 5710). A reasoned tactical decision to chose one defense over the other does not constitute ineffective assistance of counsel. *See United States v. Stern*, 519 F.2d 521, 525 (9th Cir. 1975). For all of these reasons, petitioner has not shown to be unreasonable the California Supreme Court denial of his claim. Accordingly, it is **DENIED**.

### 3. CLAIM 15.

Claim 15 alleges that trial counsel rendered ineffective assistance during closing argument in the guilt phase by conceding petitioner's guilt and assassinating his character. Specifically, petitioner argues that counsel told the jury that there was "nothing likeable" about petitioner; that there was "no explanation" as to why petitioner committed the crimes; that the case was not an easy one to argue, in part because of the amount of evidence introduced against petitioner; and counsel agreed that every killing constituted a murder and every shooting an attempted murder (Merits Br. at 15–17). According to petitioner, these concessions amounted to a denial of counsel at a critical stage of the proceeding in violation of petitioner's constitutional rights as outlined in *United States v. Cronic*, 466 U.S. 648, 658 (1984).

Respondent argues that *Cronic* does not apply because "[c]laimed failures at 'specific points' are evaluated under *Strickland*" (Opp. at 9). He asserts that counsel raised a classic reasonable doubt defense regarding who committed the murders, the degree to be assigned to the murders, and challenging the prosecution's narrative around the gun, which ballistics tied to each count. Accordingly, he states that the California Supreme Court denial of this claim cannot be deemed unreasonable (*id.* at 11).

On state habeas, the California Supreme Court denied this claim without comment.

### A.      Legal Standard.

Petitioner misstates the legal standard.  Courts presume prejudice and ineffective assistance in the rare cases where counsel  "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 658-62.  *See*, *e.g.*, *United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir. 1991) (prejudice presumed where counsel conceded in argument to jury that there was no reasonable doubt regarding factual issue in dispute).  In such a case, a petitioner need not show that there is a reasonable probability that the outcome would have been different.  *Id.* at 659.

For *Cronic's* presumption of prejudice to apply, the attorney's failure must be "complete."  *Bell v. Cone*, 535 U.S. 635, 696–97 (2002).  The court must consider the proceeding as a whole; that counsel failed to subject the prosecution's case to meaningful adversarial testing at specific points does not trigger presumption of prejudice.  *Id.* at 696-97.  *But cf. Musladin v. Lamarque*, 555 F.3d 830, 837-38 (9th Cir. 2009) (disagreeing with party's assertion that reviewing court should focus on the pervasiveness of the error in place of *Cronic's* bright-line rule that deprivation of counsel at a critical stage is automatically reversible error).  *Cronic* provides a general standard applicable to claims regarding the denial of counsel at a "critical stage" of the proceedings.  *Musladin*, 555 F.3d at 836, 839.  The phrase "critical stage" denotes "'a step of a criminal proceeding, such as arraignment, that held significant consequences for the accused.'"  *Id.* (quoting *Bell*, 535 U.S. at 695–96).

Petitioner argues that his trial attorney's concessions during closing argument constituted a failure to subject the prosecution's case to "meaningful adversarial testing" (Merits Br. at 17, citing *Cronic*, 466 U.S. at 659)  However, a review of his attorney's closing argument shows that the concessions of guilt and the "assassination" of petitioner's character were not as complete as petitioner asserts.  Moreover, the complexities of capital case litigation require a different analysis that recognizes the two-phase nature of the proceedings and the importance of avoiding a capital sentence.  *See Florida v. Nixon*, 543 U.S. 175, 189–92 (2004) (reversing Florida Supreme Court decision that held that trial counsel committed *Cronic* error by admitting

the defendant had committed the murder in question and holding that the case should have been analyzed under *Strickland*).

In *Nixon*, the state had amassed a significant amount of evidence against the defendant. In response, his trial attorney chose to admit Nixon's guilt in the closing argument in the guilt phase, to preserve credibility at the penalty phase, where he hoped to convince jurors to save Nixon's life by arguing the mitigating evidence. *Nixon*, 543 U.S. at 183–84. Nixon argued to the Florida Supreme Court that counsel's failure to obtain his consent to an admission of crime at a critical stage of the proceedings constituted a complete deprivation of the assistance of counsel. The Florida Supreme Court applied *Cronic* and found that Nixon had been denied his right to the effective assistance of counsel at a critical stage of the proceeding.

The Supreme Court reversed. As an initial matter, it held that the Florida Supreme Court committed error when it applied *Cronic*, a decision the state court based on an inapt analogy of a guilt concession by counsel to entry of a guilty plea. It then found that on the record before it, it could not find that counsel's concession ranked as a "'fail[ure] to function in any meaningful sense as the Government's adversary.'" *Id.* at 190, quoting *Cronic*, 466 U.S. at 666.

Capital cases, it said, posed "daunting challenges" to attorneys in "developing trial strategies, not least because the defendant's guilt is often clear." *Id.* at 191. It noted that an attorney's best strategy might be avoidance of execution, leading them often to focus on the penalty phase. "In this light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in 'a useless charade.'" *Id.* at 192, quoting *Cronic*, 466 U.S. at 656–57, n.19.

In situations where an attorney has consulted with a client and advised that a concession of guilt is in the client's best interest, then *Strickland v. Washington*, 466 U.S. 668 (1984), applies.[2]

---

[2] The Supreme Court recently held that an attorney who concedes guilt over a defendant's express objection commits structural error. *McCoy v. Louisiana*, __ U.S. __, 138 S.Ct. 1500, 1511 (2018). Petitioner has not asserted that counsel failed to advise him of the strategy of conceding guilt to one second-degree murder and one attempted murder. Accordingly, *Strickland* applies.

### B.    Merits of Claim.

The trial attorney in *Nixon* actually admitted the defendant's guilt in the opening statement and advised the jury to focus on the penalty phase. *Id.* at 182. Nonetheless, the trial attorney objected to the admission of prejudicial evidence, cross-examined prosecution witnesses, and made a number of objections regarding proposed jury instructions. He re-emphasized Nixon's guilt in his closing argument and urged the jury to remain open to sparing Nixon's life during the penalty phase. The Supreme Court found that Nixon's attorney did not render deficient performance. The Court stated, "[I]f counsel's strategy, given the evidence bearing on the defendant's guilt, satisfies the *Strickland* standard, that is the end of the matter." *Id.* at 192.

Here, the trial attorney's closing argument concessions clearly constituted a deliberate strategy to retain some level of credibility and minimize the possibility petitioner would receive a capital sentence. Petitioner's counsel's closing argument, which addressed charges for four murders, six attempted murders, and two separate special circumstances, totaled ninety-eight pages. Early on in his statement, counsel said, "I will be as honest as I possibly can in terms of looking at the evidence. The reason for that is very simple. Because if I am not honest with you, you're going to disregard me" (26 RT 5664). His primary concern was that the jury would look at all of the cases collectively instead of reviewing each on its own merits (26 RT 5663). Thus, he started by conceding that the prosecution had proven its case on the August murder and Stokes attempted murder beyond a reasonable doubt (26 RT 5664–65). He did not, however, concede that the prosecutor had proven that petitioner committed first-degree murder with respect to August (26 RT 5676). Later, he argued in depth that the prosecution had failed to meet its burden as to first-degree murder in the August case (26 RT 5696–5700).

Defense counsel then addressed the Sloan murder, which he argued the prosecutor had supported with the least amount of evidence (26 RT 5677). He noted that the witnesses had described an assailant who appeared to be black (*ibid.*). Witnesses never identified petitioner as appearing black, despite his being mixed race. He also distinguished Sloan from the other murders for which the state tried petitioner on the ground that it appeared to be an assassination

28

and nothing about it fit with the other crimes (26 RT 5707–08). He explained that if the prosecution intended to use a similar modus operandi as a continuous thread, it broke with the Sloan case (26 RT 5708).

Counsel turned to the Noyer and Rochon murders and explained his theory that co-defendant Clark's statements could only be credited up until the point he realized he had become a suspect and would need to pin the murders on someone else (26 RT 5704). He also challenged the prosecution theory that petitioner had maintained control over the gun at all times or was even present at the murders (26 RT 5709–12). He then contrasted the evidentiary holes in these murders with the strong case the prosecution had presented for the August murder (26 RT 5713). Counsel concluded the discussion of the Noyer murder by explaining how the prosecution had failed to show that petitioner both knew and supported Clark's intent to murder Noyer and, therefore, could not be found guilty under an aider and abettor theory (26 RT 5720–22). In concluding his discussion of the Rochon murder, counsel returned to his message that Clark could not be trusted and no evidence supported his statement (26 RT 5726–29).

In wrapping up his discussion of the murders, counsel returned to the issue of degree. While he had stated previously that the Sloan killing was first-degree because of the assassination nature of it (26 RT 5707), he stressed toward the end of his argument that if the jury believed that petitioner was present at all of the murders and participated in them, he had not shown the sort of behavior of someone who had premeditated and deliberated (26 RT 5732). As an example of this, counsel cited Clark's statement that petitioner stated, "I've got to kill someone," while driving and then started rocking back and forth before killing Ms. Rochon (*ibid.*). Counsel stated that if petitioner had acted as relayed by Clark, petitioner was then a "sick person" who could not engage the sort of careful premeditation and deliberation required for first-degree murder (26 RT 5733). He then applied this logic to the Stokes murder as well (*ibid.*)

Turning to the attempted murder of Janelle Lee, counsel stressed that the victim identified a live line-up in which petitioner participated and she selected someone else (26 5735–36). For the other attempted murders, he argued that the only connection to petitioner

29

was the gun, though he did acknowledge a lack of evidence contradicting the prosecution's case for those particular charges (26 RT 5737). He then discussed the gun, challenging the prosecution's narrative that it was a unique weapon and that petitioner viewed the gun almost as an extension of himself, such that he would be reluctant to give the gun to anyone else (26 RT 5738–42).

In conclusion, counsel argued that the jury could not convict petitioner of the lying-in-wait special circumstance because he did not have the requisite waiting and deliberation period (26 RT 5749–50). He also differentiated the specific finding the jury would have to make for a lying-in-wait special circumstance for the Noyer murder based on the prosecution's aiding and abetting theory (26 RT 5751–52). He ended by challenging some of the circumstantial evidence the prosecution had introduced, namely the envelope on which someone had written what the prosecution theorized were California Penal Code sections and the collection of newspaper articles about the shootings, both found in petitioner's apartment (26 RT 5756–58).

Petitioner argues that his trial attorney advised the jury they had only one issue to deliberate: whether the prosecution had demonstrated deliberation beyond a reasonable doubt (Merits Br. at 15). Not so. Trial counsel conceded one murder and arguably conceded the attempted murders (*see* 26 RT 5758). This appeared to be part of a deliberate strategy to give his client the "best chance" (*ibid.*). As discussed, counsel challenged the prosecution's case in depth regarding three of the murders, the lying-in-wait special circumstance, and the prosecution's narrative around modus operandi and the gun. This representation does not constitute an entire failure "to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 658–62. Rather, this approach falls under that contemplated by *Nixon* wherein an attorney faced with a significant amount of evidence against his client must present the best case possible to save his client's life.

Petitioner's citation to *United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir. 1991), does not command an alternate determination (*see* Reply at 2). In addition to not being "clearly established federal law," it also is inapposite. There, the petitioner faced one count of bank robbery and sentencing as a career criminal, which his counsel conceded the prosecution had

proven beyond a reasonable doubt. *Swanson* concerned one count, not a combined ten charges plus two special circumstances. And while Swanson faced the rest of his life in prison if convicted, he did not face execution. Similarly, *Yarborough v. Gentry*, 540 U.S. 1 (2003), does not provide relief. The defendant there had been convicted of assault with a deadly weapon. The choices his defense attorney had to make did not concern minimizing damage to preserve his client's life.

Petitioner has failed to show that his counsel rendered deficient performance in conceding one murder and the attempted murders in an attempt to procure a not-guilty finding on the other murders, or in the worst case, secure only second-degree murder convictions. A difference of opinion as to trial tactics does not constitute denial of effective assistance, *see United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984), cert. denied, 469 U.S. 838 (1984); *see, e.g., Bell*, 535 U.S. at 701–02 (not unreasonable for state court to hold decision to waive closing argument in penalty portion of capital case was competent tactical decision, when waiver prevented "very persuasive" prosecutor from arguing).

Petitioner also argues that defense counsel rendered deficient performance by assassinating his character (Merits Br. at 17). At one point, counsel did say, "[T]here may be nothing likeable about Mr. Stevens" (26 RT 5678). However, he did so within the context of explaining that whether the jury liked petitioner was irrelevant. "By candidly acknowledging his client's shortcomings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case." *Swanson*, 540 U.S. at 9.

The petitioner has failed to show that the California Supreme Court denial of this claim constituted an unreasonable application of clearly established federal law or an unreasonable application of the facts to that law. Accordingly, it is **DENIED**.

### 4. CLAIM 16.

Claim 16 argues that trial counsel rendered ineffective assistance by failing to control defense witness Dr. Kormos's production of documents to the prosecution. Specifically,

petitioner challenges the production of notes authored by Dr. White, which he says should not have been passed on because Dr. Kormos did not testify as to them, rendering them irrelevant and the information within prejudicial. This failure, petitioner argues, deprived him of the right to be free from self-incrimination, due process, equal protection, a fair trial, the effective assistance of counsel, the right to present a defense, and the right to be free of cruel and unusual punishment pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments (Merits Br. at 18–19).

Respondent argues that petitioner has provided no clearly established federal law to show an entitlement to relief on this claim. In particular, he argues, petitioner did not show that any law required counsel to monitor the transfer of documents from Dr. Kormos to the prosecution and petitioner failed to provide a declaration from Dr. Kormos saying that he did not read Dr. White's notes or rely on them (Opp. at 12). On state habeas, he California Supreme Court denied this claim without comment.

Petitioner's argument relies upon the premise that Dr. Kormos gave no indication that he read that Dr. White's notes or that he relied upon them in forming his opinion as to petitioner's mental status (Merits Br. at 27–28). The record belies this assertion.

During cross-examination, the prosecutor asked Dr. Kormos where he had learned that petitioner watched the movie *Extreme Prejudice* multiple times, a movie which the psychiatrist found to be an important piece of information in forming a psychiatric portrait of petitioner (29 RT 6636; *see also* 29 RT 6473). Dr. Kormos stated, "It was in Dr. White's notes, and I asked him about it . . . ." That statement clearly indicates that the defense expert read Dr. White's notes. Moreover, during redirect, defense counsel asked Dr. Kormos about where he had read an independent report that petitioner had made suicidal gestures as a child and he identified an interview Dr. White conducted with petitioner's father that indicated the father knew of this (30 RT 6722–23; *see also* 29 RT 6518 ("I didn't find out about [the suicide attempts] from Charles, I found out from the records that this had happened, and then I got him to explain the incident to me")). Dr. Kormos, therefore, relied on Dr. White's notes at a minimum to support his determination that petitioner had set up suicide attempts to shock his

mother when he was twelve years old, that his father knew of the gestures, and that petitioner was being sincere when discussing those attempts. The fact that petitioner had identified the information to Dr. White, but not to Dr. Kormos and did not try to play up his attempts in an effort to impress the psychiatrist made Dr. Kormos find petitioner credible (29 RT 6519). Thus, Dr. Whites' notes formed a part of Dr. Kormos's evaluation of petitioner.

Petitioner notes that Dr. Kormos did not call Dr. White to discuss her notes (Merits Br. at 19). Dr. Kormos explained that he chose not to call her because her notes seemed "pretty self explanatory" and that he did not believe she could add to what the notes contained because she had not seen petitioner in several years (30 RT 6722).

Contrary to petitioner's premise, the record indicates that Dr. Kormos did read and rely on Dr. White's notes to at least some extent in his evaluation of petitioner. Thus, as acknowledged by petitioner, the district attorney had a right to cross-examine Dr. Kormos about the notes (Merits Br. at 20, citing *People v. Coleman*, 48 Cal.3d 112, 151–52 (1989)).

Because Dr. Kormos acted properly in turning over Dr. White's report, trial counsel did not render ineffective assistance. As such, petitioner has failed to show that the state court denial of this claim constituted an unreasonable application of clearly established federal law or an unreasonable application of the law to the facts. This claim is **DENIED**.

**5.      CLAIM 21.**

Claim 21 argues that the cumulative impact of all errors in both phases of trial resulting from trial counsel's ineffective assistance deprived petitioner of his constitutional rights (Merits Br. at 22). The California Supreme Court denied this claim without comment on state habeas.

Counsel attempt to use the catch-all of cumulative error to litigate claims previously dismissed by petitioner.[3] They argue that because petitioner did not seek to withdraw claim 21 or the petition exhibits associated with the claims he successfully sought to dismiss, he necessarily assented to the consideration of any cumulative error impact resulting from the dismissed claims (Merits Br. at 35). Claims 13, 14, 15, 16, 17, 19, and 20 were removed from

---

[3] To the extent counsel attempt to challenge the March 13, 2015 order denying the motion for a psychiatric evaluation, such a challenge properly is brought in a motion for reconsideration or a renewed motion for psychiatric evaluation based on relevant authorities. The Court declines to relitigate that issue here.

33

the petition. No law allows the grant of relief for errors arising from claims not part of the petition, whether individually or cumulatively. Counsel have presented no authority to the contrary. It is also noted that there is no indication petitioner agrees to pursuing a cumulative error claim based on possible errors contained within the claims he worked so hard to dismiss.

Petitioner next challenges the denial of claims 7, 8, 9, and 10. Instead of arguing the cumulative impact of trial counsel's errors, he argues that this Court erred in denying the claims, saying, "The question that the Court must consider is how the jury would have perceived the Sloan and August murders without the Rochon and Noyer murders included" (Merits Br. at 95). Not only is this an untimely and improper motion for reconsideration, as with claim 11B, it focuses on the wrong question. Petitioner can only obtain federal habeas relief if he can show the California Supreme Court's denial of claims 7, 8, 9, and 10 "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Richter*, 562 U.S. at 101. Moreover, he can only obtain relief on the instant claim if he makes the same showing.

Petitioner argues for claim 7 that trial counsel rendered ineffective assistance for failing to research properly and file a motion to sever petitioner's trial from that of co-defendant Clark's on the ground of antagonistic defenses. Within his argument, petitioner acknowledges that counsel filed a motion to sever (Sec. Rd. Merits Br. at 14). Counsel based the severance motion on the "*Bruton-Aranda*" rule, which prevents the introduction of inculpating statements by one co-defendant from inculpating another (4 CT 1032–1033, citing *Bruton v. United States*, 391 U.S. 123 (1986) and *People v. Aranda*, 63 Cal.2d 518 (1965). After a period of negotiation regarding proper redaction of Clark's statement, petitioner's trial attorney assented the revised version and withdrew the motion to sever (1 RT 90). Petitioner argues that counsel's decision constituted ineffective assistance.

As noted, a difference of opinion as to trial tactics does not constitute denial of effective assistance, *Mayo*, 646 F.2d at 375, and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available, *Bashor*, 730 F.2d at 1241. Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances. *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). Petitioner has not shown counsel's failure to request severance following the negotiation of Clark's redacted statement to not be a strategic trial decision. Nor has he shown that the motion to sever based on antagonistic defenses would have been granted. *Wilson*, 185 F.3d at 990.

California holds a statutory preference for joint trials of jointly charged defendants. Cal. Pen. Code § 1098 ("When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court orders separate trials."). Trial courts retain the discretion to grant a motion for severance. *People v. Keenan*, 46 Cal.3d 478, 499–500 (1988). Severance may be granted where a defendant faces an incriminating confession by a co-defendant, prejudicial association with co-defendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a co-defendant could give exonerating testimony. *Ibid.*; *see* also *People v. Hardy*, 2 Cal.4th 86, 167 (1992). Conflicting defenses does not necessitate severance. *Hardy*, 2 Cal.4th at 168. "If the fact of conflicting or antagonistic defenses alone required separate trials, it would negate the legislative preference for joint trials and separate trials 'would appear to be mandatory in almost every case.'" *Ibid.*

To obtain severance on the ground of antagonistic defenses, a criminal defendant must "demonstrate that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" *Ibid.*, citing (*United States v. Davis*, 623 F.2d 188, 194–195 (1st Cir. 1980). "Stated another way, 'mutual antagonism' only exists where the acceptance of one party's defense will preclude the acquittal of the other." *Ibid.* "If 'there exists sufficient independent evidence against the moving

35

1  defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses

2  do not compel severance.'" *People v. Letner and Tobin*, 50 Cal.4th 99, 150 (2010) (citation

3  omitted).  In the present case, independent evidence implicated petitioner in Leslie Noyer's

4  murder.

5       Petitioner's hand print was on the stolen car found at the scene of Noyer's murder.

6  The bullet jacket found at the scene had polygonal rifling consistent with a Desert Eagle gun.

7  Noyer's murder occurred in petitioner's neighborhood.  Two of the newspaper clippings found

8  at petitioner's apartment covered the Noyer murder.

9       Moreover, the decision not to sever the two defendants appears to be a tactical one.

10  The question of the admissibility of the totality of Clark's confession in a separate trial for

11  petitioner remained open (1 RT 23, 53).  However, as petitioner's trial attorney noted, once

12  Clark took the stand in his own defense, "all [his] statements bec[a]me impeaching material"

13  (1 RT 96).  And petitioner's attorney made the most of those inconsistent statements during his

14  closing, attempting to paint the Noyer murder as an event perpetrated solely by Clark (26 RT

15  5702–5705).

16       Trial counsel engaged in protracted negotiations to get in Clark's statements in a way

17  that provided the least prejudice to petitioner as possible with the most inculpating evidence of

18  Clark.  Given California's preference for joint trials and the trial court's insistence that the

19  parties negotiate on the statement, petitioner has not shown that the trial court would have

20  granted a motion to sever based on antagonistic defenses.  Moreover, he has not shown that the

21  failure to sever prejudiced him.  While Clark did say a number of damaging things about

22  petitioner when he took the stand, there is no guarantee that the prosecutor would not have called

23  Clark as a witness in a separate trial against petitioner.  Thus, petitioner has not shown

24  prejudicial error or that the California Supreme Court's denial of this claim was unreasonable.

25       Claim 8 argues that trial counsel rendered ineffective assistance by failing to move to

26  exclude Clark's extrajudicial statements (Sec. Rd. Merits Br. at 19).  Petitioner argues that the

27  statements were unreliable.  Petitioner has failed to show that such a motion would have been

28  granted.  Moreover, as noted, trial counsel used the inconsistencies within those statements to

cast Clark as a liar who sought to pin the blame on anyone following his realization of the consequences of having confessed.

Petitioner argues that Clark's prejudiced petitioner because Clark said that petitioner "was a car thief (20 RT 4462–63), shot at cars (24 RT 5168), killed other people (20 RT 4524–25), carried a gun (21 RT 4576), talked about robbing people (21 RT 4665), said he needed 'to shoot somebody' (21 RT 4646), made hollow point bullets (21 RT 4657), [and] was prejudiced against 'fags' (21 RT 4731)" (Sec. Rd. Merits Br. at 20). Considering that police arrested petitioner when he fled from a stolen car, that substantial evidence supported petitioner having shot at several cars and killing multiple people, and petitioner dropped his gun when running from the police, little of this would be new information to the jury. Clark's reference to killing "someone," not "other people," pertains to the Rochon murder, not to uncharged criminal activity. Criminalist Lee testified to viewing hollow point bullets collected from one of the crime scenes (20 RT 4257).

Regarding the statement that petitioner hated "fags," Clark sandwiched it between testimony that he lied to police and that, when given questions with two answers, Clark answered the way he thought Sergeant Roth wanted him to (20 RT 4730–33). Specifically, he admitted that he made up a female companion for Noyer on a "lark" (20 RT 4730). Clark testified that he had no idea about Noyer's sexual preference (21 RT 4731). And while he stated that he did not believe that his response about petitioner's feelings regarding homosexuals came up during the discussion of Noyer's murder, Clark's testimony preceding and following the statement concerned facts he fabricated during his police interviews (*ibid.*). Within the context of that portion of Clark's testimony, his statement about petitioner reads like another fact he manufactured because he thought that's what the police wanted him to say. Moreover, the original statement to police appears on a tape that was admitted into evidence. Thus, the jury had access to it anyway. In light of this context, petitioner cannot show that trial counsel rendered deficient performance for failing to object, nor that such an objection to any of the comments would have been sustained. Accordingly, he has not shown the California Supreme Court acted unreasonably when denying the claim.

Claim 9 challenges trial counsel's decision to withdraw a request for accomplice instructions for Clark's testimony because evidence established Clark as an accomplice, if not a principal, for the Noyer murder and a likely accomplice to the Rochon murder (Sec. Rd. Merits Br. at 23). Petitioner asserts that had the instructions been given, the jury likely would not have convicted him of the Rochon murder (*id.* at 25).

Following an off-the-record, in-chambers discussion about proposed jury instructions, the trial court announced on the record, "I would note for the record that in the course of our conference relative to instructions, the following instructions or initially preliminarily proposed instructions were withdrawn. Those are . . . 3.10 to through and including 3.18 [instructions relating to accomplice testimony] that were preliminarily requested by the defendant Stevens" (25 RT 5496). The record provides no further explanation and petitioner has not provided a declaration from prior counsel explaining what happened during the conference and why the request for those instructions was withdrawn. It was quite possible the court indicated a predisposition to deny the request for the instructions. Clark could not have been found to be an accomplice as to the Rochon murder because the evidence did not support it.

The prosecutor explained clearly in his closing argument why Clark did not amount to an accomplice for the Rochon murder, even though Clark testified that he rode in the car with petitioner and did not report the murder afterward. The prosecutor said, "There was no evidence [Clark] had knowledge of what was going on, or if he did have knowledge, that he did something with the intent to or purpose of encouraging, facilitating or permitting to promote the act itself (sic) . . . . But Clark under the evidence that we have here, is not guilty of the killing of Lori Rochon because he wasn't doing anything, because there isn't any evidence of that" (25 RT 5565–66). Despite petitioner's attestations otherwise, evidence aside from Clark's statement does connect him with the Rochon murder.

Criminalist Lee testified that the slug recovered from Rochon's body came from a Desert Eagle (RT 3976–77). He just could not say definitively that it came from petitioner's. And while the Desert Eagle could be purchased in a wide variety of regional gun shops, Lee testified that only three Desert Eagles had come in to the crime lab in the previous five years

(RT 3974) and no bullets or casings had come into the crime lab with polygonal rifling until the Noyer murder (RT 3990).  Additionally, Rochon was murdered when someone drove up alongside her car and shot through the window, the same modus operandi that matches the August murder, where petitioner was apprehended at the scene.  Jurors did not need to believe Clark to convict petitioner of Rochon's murder.  Finally, the trial court did instruct the jury extensively in how to determine credibility, including, "A witness who is wilfully false in one material part of his or her testimony, is to be distrusted in others" (27 RT 5954, *see also* 27 RT 5952–5955).  Petitioner has not shown that the California Supreme Court denial of this claim was unreasonable because he has not prejudicial deficient performance.

Claim 10 argues that trial counsel rendered deficient performance by failing to object "when investigating officer Arthur Roth improperly opined that of all the different versions given by co-defendant Clark regarding Leslie Noyer's killing, the version regarding Mr. Stevens shooting Ms. Noyer while Mr. Clark held her 'rang true.' (24 RT 5193)." (Sec. Rd. Merits Br. at 25).  Petitioner states that this constituted improper lay testimony as to Clark's credibility.

The full exchange occurred thus:

> Prosecutor: Now, why did you want to talk with [Clark] the following morning?
>
> Sergeant Roth: Well, at the conclusion of our fourth taped statement, I was of the Opinion, based upon information that I had, and also by his demeanor that he was not being truthful.  That although he was giving us his — a fourth taped statement, or a continuing version of what took place at that murder and many others, there were many unresolved questions.  I believe that this statement of him holding this woman while [petitioner] shot her rang true.

(24 RT 5193).  Petitioner's trial counsel did not object.

Petitioner has not shown that such an objection would have been sustained, nor has he provided any information from counsel indicating why they chose not to object.  All of the cases he cites involve situations where a witness indicates that another witness was either telling the truth or not.  He does not cite a comparable situation wherein a witness indicates both that another witness was lying and possibly telling the truth.  Moreover, Clark himself later

1    disavowed this version of events. As noted by petitioner in other claims, the jury hung on the

2    murder charge as it applied to Clark, so it does not appear that Sergeant Roth's statement

3    bolstered the credibility of this version of Clark's account sufficient to result in the return of

4    guilty verdicts. Petitioner, thus, has not shown the California Supreme Court was unreasonable

5    in finding no prejudicial error.

6        Petitioner next argues that the errors contained within claims 7, 8, 9, and 10 must be

7    considered in combination with other errors, specifically trial counsel's purported failure to

8    retain a ballistics expert, to effectively cross-examine the prosecution's ballistics expert,

9    conceding guilt and other errors during the guilt phase closing argument, and failing to supervise

10   the distribution of documents from Dr. Kormos to the prosecution (Merits Br. at 96). Petitioner

11   has failed to show a single error by counsel, as discussed in the orders resolving his ineffective

12   assistance of counsel claims. Where there is no single constitutional error existing, nothing

13   can accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524

14   (9th Cir. 2011). Most importantly, he has not shown the California Supreme Court's denial of

15   the claim constituted an unreasonable application of clearly established federal law or an

16   unreasonable application of the facts to that law. Accordingly, this claim is **DENIED**.

17       **6.    CLAIM 24.**

18       Claim 24 argues that the lying-in-wait special circumstance as presented to the jurors

19   violated petitioner's constitutional rights because the jury instruction contained unclear

20   language. It also asserts that the special circumstance itself fails to distinguish between all first-

21   degree murders and those eligible for the death penalty.

22       The California Supreme Court denied this claim on direct appeal. The court

23   distinguished between the lying-in-wait special circumstance and lying-in-wait first-degree

24   murder by noting that "the lying-in-wait special circumstance requires a physical concealment

25   or concealment of purpose and a surprise attack on an unsuspecting victim from a position of

26   advantage." *Stevens*, 41 Cal.4th at 203. It also noted that the special circumstance required the

27   intent to kill, whereas lying-in-wait murder did not. *Id.* at 204. The court determined that the

28   instruction adequately defined the temporal component of the special circumstance. *Ibid.*

**A.    Constitutionality of Lying-in-Wait Special Circumstance**.

This claim argues that the lying-in-wait special circumstance violates the Constitution because it fails to "'genuinely narrow' those persons eligible for the death penalty, "reasonably justify" the imposition of the death penalty on the defendant compared to other murderers, and "provide a meaningful basis" to distinguish death penalty cases from those that are not (Merits Br. at 100, quoting *Romano v. Oklahoma*, 512 U.S. 1, 7 (2004) and *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980)).  Petitioner provides no clearly established federal law that would entitle him to relief on this claim.  As noted by respondent, our court of appeals has found the lying-in-wait special circumstance to pass constitutional muster.  *See Morales v. Woodford*, 388 F.3d 1159, 1173–1178 (9th Cir. 2004).  Petitioner provides nothing to the contrary.  Accordingly, this claim is **DENIED**.

**B.    Jury Instruction Subclaim.**

Petitioner also asserts that the jury instruction on the lying-in-wait special circumstance likely confused jurors because "the jury was instructed that 'mere concealment of purpose' is not sufficient;" they also must find "the 'substantial period of watching and waiting for an opportune time to act'" (Merits Br. at 101).

The instruction provided to the jury read:

> To find that the special circumstance, referred to in these instructions as murder while lying in wait, is true, each of the following facts must be proved:
>
> 1. The defendant intentionally killed the victim, and
>
> 2. The murder was committed while the defendant was lying in wait.
>
> The term "while lying in wait" within the meaning of the law of special circumstances is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or by some other secret design to take the other person by surprise even though the victim is aware of the murderer's presence. The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.
>
> Thus, for a killing to be perpetrated while lying in wait, both the concealment and watchful waiting as well as the killing must occur during the same time period, or in an uninterrupted attack commencing no later than the moment concealment ends.

41

1
2
3

>If there is a clear interruption separating the period of lying in wait from the period during which the killing takes place, so that there is neither an immediate killing nor a continuous flow of the uninterrupted lethal events, the special circumstance is not proved.

4
5
6
7

>A mere concealment of purpose is not sufficient to meet the requirement of concealment set forth in this special circumstance. However, when a defendant intentionally murders another person, under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage, the special circumstance of murder while lying in wait has been established

8   (27 RT 5965–66).

9   Petitioner argues that the instruction was "convoluted and impossible to understand"

10  because "[w]hile the instructions provide that 'mere concealment of purpose' is not enough

11  and must be accompanied by 'a substantial period of watching and waiting' and a 'surprise

12  attack,' it also dispenses with the 'substantial period of watching and waiting' requirement by

13  allowing it to be satisfied by the temporal element already pre-existing in all first degree

14  murders that reach the lying-in-wait instruction" (Merits Br. at 98).  Petitioner goes on to argue

15  that the instruction given to the jury "fails to provide a basis for distinguishing between

16  murders that warrant the death penalty from those that do not" (Merits Br. at 101).  Petitioner

17  conflates his jury instruction claim with his argument that the California Supreme Court's

18  analysis of that claim rendered the special circumstance unconstitutional.

19  In denying this claim on direct appeal, the California Supreme Court held that

20
21
22
23

>any overlap between the premeditation element of first degree murder and the durational element of the lying in wait special circumstance does not undermine the narrowing function of the special circumstance.  (Citation omitted.)  Moreover, . . . concealment of purpose inhibits detection, defeats self-defense, and may betray at least some level of trust, making it more blameworthy than premeditated murder that does not involve surprise.

24
25
26
27

>A similar narrowing distinction is discernible between the lying-in-wait special circumstance and lying-in-wait murder because the former requires an intent to kill, while the latter does not. (Citations omitted.)  [A]ny overlap between the elements of lying in wait in both contexts does not undermine the narrowing function of the special circumstance.  (Citations omitted.)

28

>Defendant further contends that "[i]f the temporal element is . . . equivalent to that of first degree murder," the "requirement of a

42

> 'substantial period of watching and waiting' is a confusing, contradictory and unnecessary addition to the instruction," making the instruction "incorrect on a material point," and results in the concept of lying in wait being defined in the instruction in materially different ways. We disagree with these assertions, and conclude the instruction is internally consistent. The instruction requires a period of time long enough to show a "state of mind equivalent to premeditation or deliberation." (Citations omitted.) This formulation describes the durational requirement of the special circumstance, which is demonstrated by a substantial period of watching and waiting during which the defendant is physically concealed or conceals his purpose.

*Stevens*, 41 Cal.4th at 204. A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court on habeas review. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

To prevail on a claim that a vague or ambiguous jury instruction violated his constitutional rights, petitioner must show there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle v. McGuire*, 502 U.S. 62, 72 & n.4 (1991). Petitioner's argument, however, focuses not on how the jury could have misapplied the instruction, but rather how the California Supreme Court's analysis conflates elements that the jury was required to find. He, thus, has failed to show a constitutional violation as to the lying-in-wait instruction given to the jury. The California Supreme Court's denial of this claim did not constitute an unreasonable application of clearly established federal law or an unreasonable application of the facts to that law. The claim is, therefore, **DENIED**.

### 7.     CLAIM 25.

Petitioner withdrew Claim 25 in his merits brief (Merits Br. at 103).

### 8.     CLAIM 28.

Claim 28 argues that petitioner's conviction and capital sentence violate various instruments of international law because the death penalty is imposed in a racially discriminatory manner (Sec. Am. Pet. at 277). This claim is not cognizable on federal habeas. Petitioner has failed to cite any clearly established federal law that applies to or would entitle him to relief on this claim. Thus, it is **DENIED**.

**9.     CALIFORNIA SUPREME COURT'S REFUSAL
TO ISSUE AN ORDER TO SHOW CAUSE.**

In his first merits brief, petitioner challenged the California Supreme Court's refusal to issue an order to show cause on his state habeas petition and failure to hold an evidentiary hearing, noting that the failure to do so rendered the state court's decision unreasonable (First Rd. Merits Br. at 14–15, citing *Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003)). This argument would apply only to petitioner's ineffective assistance of counsel claims and the cumulative error claim.  Petitioner presented all other claims to the state court on direct appeal.

Respondent argues that petitioner's challenges to the California Supreme Court's adherence to its own processes is not cognizable on federal habeas (First Rd. Opp. at 2). Additionally, he adds that the Supreme Court has indicated clearly that silent denials constitute merits-based denials and that federal courts must give deference to them (*ibid.*, citing *Richter*, 562 U.S. at 98–99).

*Nunes* does not legally or factually compel the result for which petitioner argues. The holding of *Nunes* does not require a state court to offer an evidentiary hearing in every case in order for the state court decision to be considered "reasonable."  Nor are the factual findings made by the state court in *Nunes* comparable to this case.

Nunes was charged with one count of murder and three counts of assault with a firearm for the shooting of a man he found sleeping in his estranged wife's bedroom.  The first two of Nunes' trials ended in hung juries.  The third trial ended with a conviction, which was reversed on appeal.  Before Nunes' fourth trial, the prosecutor made a plea offer to Nunes' counsel. Nunes claimed that his attorney informed him incorrectly of the terms of the offer; that his counsel told the prosecutor that Nunes had rejected the plea bargain; and that by the time Nunes finally could reach his counsel to clarify the offer after the start of his trial, the offer had already expired.  Nunes' fourth trial ended in a conviction.  *Nunes*, 350 F.3d at 1049–50.

Nunes challenged his conviction on direct appeal and also by way of a state court petition for a writ of certiorari. Nunes claimed that his counsel had provided ineffective assistance by failing to inform Nunes fully of the terms of a plea offer.  The California court of appeal

rejected Nunes' claim, finding it unnecessary to hold an evidentiary hearing because Nunes had not established a prima facie case for prejudice—"that but for counsel's deficient performance, the defendant would have accepted the plea bargain." *Ibid.*

Nunes filed a Section 2254 petition in the federal district court in the Northern District of California. The magistrate judge assigned to the case held a two-day evidentiary hearing on Nunes' ineffective assistance claim, after which the magistrate judge recommended that Nunes' petition be granted, concluding that the state court ruling was (1) erroneous and (2) contrary to federal law as clearly established in *Strickland v. Washington*, 466 U.S. 668, 690–93 (1984). The district court adopted the recommendation, and the respondent appealed.

Our court of appeals found that the California Court of Appeal had acted unreasonably by rejecting Nunes' habeas petition. The Ninth Circuit focused on the state court's findings that:

> (1) the materials Nunes had included in the record were "of dubious relevance" and (2) that the state court of appeal had rejected as "simply not credible" Nunes' claim that he could not reach his attorney to clarify the plea offer. The state court had also found on the record that Nunes failed to demonstrate that he would have accepted the state's plea offer had his attorney communicated it to him accurately. The Ninth Circuit took the state court to task for having "eschewed an evidentiary hearing on the basis that it was accepting Nunes' version of the facts" when the state court had clearly discredited Nunes' credibility and rejected his assertions.

*Id.* at 1055, n. 7.

While *Nunes* found that the state court had acted unreasonably in not holding an evidentiary hearing, that case and the subsequently issued *Lambert v. Blodgett*, 393 F.3d 943, (9th Cir. 2004), make clear that holding an evidentiary hearing is not a per se requirement for a state court to reasonably determine that a petitioner's allegations are not credible or do not justify relief. *Nunes*, 350 F.3d at 1055; *Lambert v. Blodgett*, 393 F.3d at 969 (specifically "declin[ing] to accept Lambert's proposal to inject an 'evidentiary hearing' requirement as a pre-requisite to AEDPA deference").

45

**United States District Court**
For the Northern District of California

*Lambert* reiterated that district courts must extend deference to state court decisions, and further explained the level of review for questions of fact, questions of law, and mixed questions of law and fact:

> We summarize the layers of review mandated by AEDPA as follows: First, challenges to purely factual questions resolved by the state court are reviewed under § 2254(d)(2)7; the question on review is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the finding is supported by the record . . . challenges to mixed questions of law and fact receive similarly mixed review; the state court's ultimate conclusion is reviewed under § 2254(d)(1), but its underlying factual findings supporting that conclusion are clothed with all of the deferential protection ordinarily afforded factual findings under §§ 2254(d)(2) and (e)(1).

*Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir.2004).

In petitioner's case, the reasonableness of the California Supreme Court's habeas denial not as petitioner has suggested, simply a question of whether or not the court held an evidentiary hearing. Rather, the issue is whether or not the California Supreme Court's view of the record absent an evidentiary hearing was objectively reasonable in its finding of no prejudice. *Williams*, 529 U.S. at 409–11. Any other conclusion, as noted by respondent, would vitiate the deference that *Richter* requires for silent denials. The reasonableness of the state court's finding of no prejudice has been addressed above and in the prior order on the merits (*see* Feb. 21, 2018, Order, Dkt. No. 157).

**10.     MOTION TO SEAL RESPONSE.**

On November 7, petitioner's counsel were ordered to file a response to two letters sent by petitioner raising concerns about a potential conflict. Counsel move to file their response under seal because it addresses issues related to the attorney-client relationship (Administrative Motion to File Under Seal, Dkt. No. 172).

"Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents.'" *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 & n.7 (1978) ). Accordingly, when considering a sealing request, "a strong presumption in favor of access is the starting point." *Ibid.* (internal quotation marks omitted).

Courts have accepted attorney–client privilege as sufficient justifications for sealing. *See In re*

*Hewlett-Packard Co. S'holder Derivative Litig.*, No. 15-16688, 2017 WL 5712130, at *4

(9th Cir. Nov. 28, 2017) (affirming sealing decision where "[t]he special master found that HP

provided compelling reasons to justify its sealing motion, including that the documents at issue

included . . . material protected by the attorney–client privilege and the work product doctrine").

Thus, good cause exists to seal counsel's response to the November 7 order and the motion to

seal is **GRANTED**.

### CONCLUSION

For the foregoing reasons, Claims 1, 11, 12, 15, 16, 21, 24, and 28 are **DENIED**.

Claim 25 was withdrawn.

The Court **GRANTS** a certificate of appealability as to Claim 1.

The motion to seal counsel's response to the November 7 order is **GRANTED**.

**IT IS SO ORDERED.**

Dated:  January 17, 2019.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE